## JACKSON *v.* LUDELING.

1. When two or more persons have a common interest in a security, equity will not allow one to appropriate it exclusively to himself, or to impair its worth to the others. Community of interest involves mutual obligation. If, *ex. gr.*, a corporation issue many bonds and give a mortgage on all its estates to secure them, one holder of the bonds—admitting that he has a right to make use of the mortgage to enforce the payment of the bonds which he holds—has no right to employ it as an instrument by which he may become the owner of the property mortgaged at the lowest price at which it can be obtained, leaving the bonds held by his associate holders unpaid. His duty, if he uses it at all, is to make it productive of the most that can be obtained for all who are interested in it, and if he seek to make a profit out of it at the expense of those whose rights in it were the same as his own, he is guilty of fraud.

2. The managers and officers of a company where capital is contributed in shares, are in a very legitimate sense trustees, alike for its stockholders and its creditors, though they may not be trustees technically and in form. They accordingly have no right to enter into or participate in any combination, the object of which is to divest the company of its property and obtain it for themselves at a sacrifice; they have no right

to seek their own profit at the expense of the company, its stockholders, or even its bondholders. Contrariwise, in case of embarrassment to the company, and any necessity to sell the estates of the company, it is their duty, to the extent of their power, to secure for all those whose interests are in their charge, the highest possible price for the property which can be obtained for it.

3. These principles applied to a case where the local managers and officers of an embarrassed railroad, holding a small portion of its bonds, of which a much greater portion was held by non-residents, got an order of sale under a mortgage to secure the bonds, and proceeded in a hasty and rather secret way to sell it, and to buy it at a price much below its value, for themselves; the conditions of sale being made such as to render it difficult for persons generally to purchase; and the whole proceeding of sale being attended also with evidences of gross disregard of the interests of the bondholders generally, and of course of the stockholders.

4. The statute of Louisiana of March 10th, 1834, which authorizes purchasers at a sheriff's sale to apply for a monition to all persons interested who can set up any right, title, or claim to the property described, in consequence of any *informality* in the order, or decree, or judgment of the court under which the sale was made, or any *irregularity or illegality in the appointment and advertisement in time or manner of sale*, or for any other defect whatsoever, to show cause why the sale should not be confirmed and homologated, and which, if no cause be shown, makes judgment of confirmation conclusive on the world, has relation to mistakes or omissions of the officers of the law, and not any relation to the question whether the purchasers have obtained their title by fraud, or whether they are trustees *malâ fide* for others. Accordingly, a judgment of homologation under it is conclusive of nothing but that there have been no fatal irregularities of form.

APPEAL from the Circuit Court for the District of Louisiana.

This was a bill in equity filed in the court below by Jackson and many other persons against John T. Ludeling, as a first-named party, and others, his associates, to wit: John Ray, Francis P. Stubbs, Wesley J. Q. Baker, William R. Gordon, Henry M. Bry, Joseph F. McGuire, John A. McGuire, Robert Ray, Joseph P. Crossley, Charles W. Phillips, Robert C. Strother, Christopher H. Dabbs, George C. Waddell, William M. Pincaird, and James U. Horne; and also against the Vicksburg, Shreveport, and Texas Railroad Company.

The complainants were holders of six hundred and sixty,

out of seven hundred and sixty-one, bonds of $1000 each, issued by the said company, and secured by a mortgage upon the railroad and its appurtenances, and upon the franchises and personal effects of the company, together with more than four hundred thousand acres of land. Their bill was filed as well for themselves as for all other bondholders whose situation was similar to theirs. Some of them were also preferred stockholders of the company to a large amount. The mortgage was made by an authentic act on the 1st day of September, A.D. 1857, to John Ray, or bearer, to secure the full, faithful, and punctual payment and redemption of each and all the bonds issued under it to any and all the future holders thereof, and to each and every one of them, when the same should become due and payable, together with the interest accruing thereon. The relief sought by the bill was that the mortgage might be declared to be a valid lien upon all the property described therein; that a sale averred to have been made under it in 1866, to the defendant Ludeling and his said associates, be set aside, and the deed made to them by the sheriff be declared to be fraudulent and void; that the defendants might be enjoined against setting up any title under the sale and the deed; prohibited from selling any of the property, rights, and privileges of the railroad company, and required to account for all money received by them on account of the corporation, and that the mortgaged property might be decreed to be sold for the benefit of the bondholders, the preferred and other stockholders. The bill also prayed for the appointment of a receiver and for other relief.

To the bill and the relief asked, the defence set up was what was alleged to have been a judicial sale of the mortgaged property under executory process at the suit of William R. Gordon, one of the defendants; and the question of importance presented by the record was whether that sale, as against these complainants, extinguished the lien of the mortgage.

A minor point, one less relied on, related to the effect of a certain "judgment of homologation"—as it is called in

Louisiana—"in a suit of monition," instituted by the defendants under a statute of Louisiana, passed March 10th, 1834, and by which judgment the defendants contended that the validity of the sale which the present bill sought to have declared null, was conclusively established and the bill itself barred.

The court below declared that no fraud had been practiced, and that the sale must stand. It accordingly dismissed the bill.

*Messrs. H. M. Spofford and J. A. Campbell, for the appellants; Mr. W. H. Hunt, contra.*

Mr. Justice STRONG delivered the opinion of the court, stating the facts of the case as they were assumed by the court on the evidence to be, and stating also the statute of Louisiana above referred to.

The sale under consideration was made under an ex parte order, obtained from a judge in chambers on the 23d of December, 1865, at the suit of Gordon, who described himself as the owner of four of the mortgage bonds, upon which coupons amounting to $720 were due and unpaid. The petition for the order of sale did not aver that Gordon was the owner or bearer of the mortgage, or that he had any rights therein superior to the rights of any other bondholder for whom the mortgage was a security. It might, perhaps, be doubted, therefore, whether under the law of Louisiana he was in a condition to petition for executory process for a sale of the mortgaged premises, and whether the judge had any authority on his petition to order a sale. No question of this kind, however, is seriously made here, and we proceed to notice at once the manner in which the process was used, the proceedings prior to the sale and at the sale, and the actions and relations of the purchasers. Gordon's petition made no disclosure of the name of any other holder of bonds secured by the mortgage. Ostensibly he sued for himself alone. He asked for no notice, and none was given, of his application to any other bondholder,

though there were seven hundred and sixty-one bonds outstanding, held principally in other States. The order of seizure was granted by the judge on the 23d day of December, 1865, but it was not filed in the clerk's office until Saturday, the 30th of that month, late in the afternoon, and on that day the sheriff made a seizure and served a notice thereof upon H. M. Bry, who was then acting as the president of the corporation, and who subsequently became one of the purchasers at the sale. On the 2d of January, 1866, the sheriff advertised the property for sale in one newspaper published in the town of Monroe, and by posting a copy of the advertisement on the church door and another at the door of his office. The sale was appointed for the first Saturday of February, which was the earliest day on which it could be made under the law of the State. By that law the property seized was required to be appraised, and could not be sold for less than two-thirds of its appraised value. It consisted of a railroad about one hundred and ninety miles in length, with numerous water stations, buildings, warehouses, depots, and depot grounds, cars, locomotive engines, wagons, machinery, utensils, bills receivable from numerous promisors, aggregating more than $40,000, unpaid stock subscriptions exceeding $320,000, and a large land grant of several hundred thousand acres, together with the franchise of the company. To appraise all this property the appraisers were summoned to meet on February 3d, the day of the sale, at 10 o'clock A.M. They were appointed by Gordon and Bry, both of whom were purchasers at the sale. Obviously it was impossible for the persons appointed to make any fair appraisement at that time. Yet they reported one of all the property at $75,000 in legal-tender notes, and the sale proceeded. From the sheriff's return as first made, drawn up by John T. Ludeling, Gordon's attorney, and one of the purchasers, the sheriff exacted an illegal and onerous condition. The condition was, that the purchaser should pay cash to pay the interest coupons then due, with credit to meet the immature interest and bonds, and should give bonds, with personal security, for

the credit portion of the bid.   At the first cry the property was struck off to George M. Branner & Co. for $550,000; but because they failed to pay at once the interest coupons then due and presented, the sheriff immediately set up the property again in bulk, and sold and adjudicated it to John T. Ludeling, John Ray, Francis P. Stubbs, Wesley J. Q. Baker, William R. Gordon, Henry M. Bry, Joseph F. McGuire, John A. McGuire, Robert Ray, Joseph P. Crossley, Charles W. Phillips, Robert C. Strother, Christopher H. Dabbs, George C. Waddell, William M. Pincaird, and James U. Horne, the said John T. Ludeling, having bid in the property for them for the sum of $50,000, and they having complied with the terms of sale by paying the proportional amounts of the several coupons due, which were presented for payment, to wit, $10,739.83, to William R. Gordon, John T. Ludeling, and James U. Horne, the holders of one hundred and fifty-four bonds, and to F. P. Stubbs $850.68, being the amount due on the coupons he presented for payment. Such was the sheriff's return.   Two days afterwards he made a deed to the purchasers.

Were there nothing more in this case than is narrated by the brief history thus given, which is uncontradicted, it would be difficult to characterize the transactions as anything less than a great wrong perpetrated by the agency of legal forms.   The great body of the bondholders could have known nothing of the proceeding to sell the mortgaged property and discharge their lien.   Their residence was remote, and the sale was hurried as fast as the forms of law permitted.   Not a day was lost.   They were not afforded an opportunity to attend and bid at the sale, or pay off Gordon's small claim of $720.   Neither they nor their trustee were consulted.   The sale was made in a village far in the interior.   It was advertised in only one local newspaper, and not a day longer than the law required.   The appraisement was made at the last moment, and it was obviously intended to facilitate a hasty sale for a nominal price.   Onerous and illegal conditions of sale were exacted from other

bidders, but not from these purchasers, who paid nothing except to themselves. A property upon which had been expended nearly $2,000,000, together with a large stock subscription, a large grant of lands, and considerable movable property, was bought for $50,000 by the very persons who defeated a sale for a much larger price, and the purchase-money was retained by themselves.

But to a thorough understanding of the case it is necessary to consider the relation in which many of the purchasers at the sale, who are the present defendants, stood to the complainants, and how far their conduct was consistent with that relation. As we have seen, William R. Gordon, at whose suit the executory process for the sale was ordered, was the holder of four bonds. These he obtained in the month of October, immediately preceding the sale, paying for them $640, and by his purchase he became entitled to the security of the mortgage ratably with the holders of the other bonds. In equity he was a *quasi* owner in common with the other bondholders of whatever rights the mortgage gave. He was not a partner with them, nor *strictly* a tenant in common, but the relation into which he introduced himself by his purchase imposed upon him some duties. If he actually held the mortgage he held it as a trustee. Whether he did or not; it was a duty which he owed to the other bondholders not to destroy its value. When two or more persons have a common interest in a security, equity will not allow one to appropriate it exclusively to himself, or to impair its worth to the others. Community of interest involves mutual obligation. Admitting, then, that Gordon had a right to make use of the mortgage to enforce the payment of the bonds which he held, he had no right so to use it as to obtain an advantage for himself over the other bondholders. He had no right to employ it as an instrument by which he might become the owner of the property mortgaged at the lowest possible price at which it could be obtained, leaving the bonds held by his associate holders unpaid. His duty, if he used it at all, was to make it produc-

tive of the most that could be obtained for all who were interested in it, and if he sought to make a profit out of it at the expense of those whose rights in it were the same as his own, he was unfaithful to the relation he assumed, and was guilty of fraud. In *Gue* v. *The Tidewater Canal Company*,* it was said by Chief Justice Taney, when delivering the opinion of the court, that "it would be against the principles of equity to allow a single creditor to destroy a fund to which other creditors had a right to look for payment, and equally against the principles of equity to permit him to destroy the value of the property of the stockholders by dissevering from the franchise property which is essential to its useful existence."

If, now, the conduct of Gordon be observed and compared with the relation he sustained to the other mortgage bondholders it will be apparent he was utterly regardless of his duty. Before he sued out the executory process he conceived the scheme of forcing a sale of the mortgaged premises, not for the purpose of paying the debt which was a lien upon them, but for profit that might be made out of the purchase, or, as he represented in substance to one whom he requested to join in his plans, because there "was a probability of a very decided speculation from the sale." And in pursuance of this scheme, on the 10th day of January, 1866, only a few days after the executory process was placed in the sheriff's hands, he entered into a written agreement with John T. Ludeling, W. J. Q. Baker, F. P. Stubbs, G. C. Waddell, and John Ray, which had for its object the purchase of the railroad and mortgaged property for the exclusive benefit of the parties to the agreement, with no reference to the other bondholders. By this agreement he placed himself in an antagonistic position to those creditors of the company whose security he was using. Their interest was that the property should bring a full price, but his, under the agreement, was that it should be sold for the lowest price possible. Nor is this all. He him-

---

* 24 Howard, 263.

self appointed one of the two appraisers who, on the day of the sale, made an appraisement so obviously inadequate and unfair that it forces a conviction it was made collusively to enable the parties to the agreement to obtain the property at a price nearly nominal. The entire property was appraised at seventy-five thousand dollars. Five hundred and fifty thousand dollars were bid for it (though the bid was rejected), and immediately after it was adjudicated to Gordon and his associates, they were offered for their bid one million of dollars, as testified by the person who made the offer, or six hundred thousand dollars, as admitted by Ludeling, and the offer was rejected. Gordon was also a party to the steps taken by which the sheriff was induced to reject the bid of five hundred and fifty thousand dollars made by Branner & Co., and put the property up for a resale. It is impossible to look at all this without coming to the conclusion that Gordon's conduct was, from beginning to end, a violation of the duty he owed to the other bondholders, a duty growing out of his relation to them, and out of his appropriation of a security in which they had an interest nearly two hundred times greater than his own.

And the situation of the other defendants is little if any better. John Ray, Joseph F. McGuire, John C. McGuire, Christopher H. Dabbs, Wesley J. Q. Baker, Robert Ray, and Henry M. Bry were directors of the railroad company when the executory process was sued out, and when the sale was made. Bry was the vice-president and acting president, in consequence of the absence of the president, who was in Georgia. Joseph McGuire was the company's secretary and treasurer. All these parties were at hand, residents in or near Monroe. As officers of the company they had the custody and charge of the railroad and all the property of the corporation. And they held it in a very legitimate sense as trustees. Certainly they were the trustees of the stockholders, and also, to a considerable degree, of the bondholders, owners of the mortgage. We do not say they might not have purchased the property at a sale over which they had no control, and made under judicial process adverse to

the company.  Perhaps they might.  But we do say they had no right to join hands with Gordon.  They had no right to enter into or participate in a combination, the object of which was to divest the company of its property and obtain it for themselves at a sacrifice, or at the lowest price possible. They had no right to seek their own profit at the expense of the company, its stockholders, or even its bondholders. Such a course was forbidden by their relation to the company.  It was their duty, to the extent of their power, to secure for all those whose interests were in their charge the highest possible price for the property which could be obtained for it at the sheriff's sale.  They could not rightfully place themselves in a position in which their interests became adverse to those of either the stockholders or bondholders.  And this rule was peculiarly applicable to these defendants.  On the 11th of October, 1865, only about two and a half months before Gordon instituted his proceedings to effect a sale of the road, the directors had resolved that, " in pursuance of resolutions passed by a meeting of the stockholders held on October 2d, the president of the company be appointed to make arrangements with any company who, in his judgment, might be able to put the road in repair, which was theretofore in operation, and complete the balance of the road, ' *and pay the debts of the company;*' and, if such arrangements could be made, that the same be reported to the directors, and upon their approval, that such steps should be taken as might vest the road, its franchises, and other property in such company."  One of the purposes of this resolution was the payment of the debts of the company.  How, then, can it be claimed that directors who had thus resolved, in obedience to the instructions of the stockholders, were at liberty to participate in a scheme, the object and effect of which was to divest the company of all its property and franchises without the payment of its debts? How can they be permitted to join hands with those who sought to obtain that property at the lowest price, whose interest it was to have no other bidders than themselves at the sale, and whose action tended to defeat the avowed ob-

ject of the resolution passed by the directors, as well as to make worthless the security which it was their duty to protect and render in the highest possible degree fruitful?

Having thus noticed the relation in which these defendants stood towards the company, its shareholders, and its bondholders, and some of the duties and disabilities attendant upon that relation, we are prepared to inquire how those duties were performed. It is proved that a combination was formed as early as November 18th, 1865, by some of these directors to become the purchasers of the property and franchises of the company exclusively for their benefit and the benefit of those whom they might consent to associate with them. A written agreement to that effect was made and signed by John Ray, William S. Parham, and W. J. Q. Baker, both Ray and Baker being then directors. By the agreement John T. Ludeling was appointed the agent of the parties to make the purchase in their name. This was very shortly after the resolution of the board of directors, to which we have called attention, was adopted. The agreement was repugnant to that resolution, which contemplated no disposition of the property which did not provide for the payment of the debts of the company, none that might be for the exclusive advantage of some directors. The agreement was made after Wadley, the president, had left the State and gone to Georgia, where most of the bondholders resided, with a view, if possible, to effect such an arrangement as the resolution of October 11th recommended. There is no direct evidence that at this time these parties were in combination with Gordon to obtain the property for themselves by a hurried sale, conducted with the least possible opportunity for notice of his proceeding to those stockholders and bondholders resident at a distance, who had the greatest interest. But that such a confederacy subsequently existed we think ought to be inferred from what subsequently occurred. Indeed, many facts point to such a combination and can be accounted for only by it.

On the 10th of January, 1866, Ludeling, Baker, and John

Ray entered into another agreement with Gordon, Stubbs, and Waddell, by which, after reciting that proceedings had been instituted to sell the railroad, with the property thereto attached and appertaining, they agreed severally to deposit with Ludeling a sum of money to be used for the purpose of forwarding the interests of the company (*i. e.*, the associated parties) relatively to the railroad and property bought, and that the parties to the agreement should be interested in the stock, shares, and property of the company in the proportion of the amount of money put in by each one, regardless of what the property might have cost. Ludeling was designated to bid for the property, and, should he buy, was required to take the title in the names of the contracting parties and such others as might be necessary to preserve the existence of the Vicksburg, Shreveport, and Texas Railroad Company. No one was permitted to sell out his interest within six months after the purchase without the consent of a majority of the other joint owners or copartners, and after that time, namely, the expiration of the six months, the refusal was given to the company. This agreement was also signed about February 1st, 1866, by Robert Ray, another director, as he has testified. Thus these directors became avowedly confederates with Gordon to purchase the property and to purchase it for their own benefit. Thus they took a position in which it became their interest that the property should be sold at a low price; that there should be as little competition as possible, and that no efforts should be made to stay the sale, or give any more notice than a formal compliance with the law required. Thus their interests were brought into direct antagonism with the interests of the stockholders and bondholders. Thus they combined to defeat the accomplishment of the arrangement proposed by the resolution of the directors of October 11th, 1865. It is impossible to regard this combination as anything less than a plain violation of their duty, a breach of the trust reposed in them, and, if not an actual, at least a constructive, fraud.

The plan proposed by this arrangement, however, was dis-

turbed unexpectedly by the arrival in Monroe of James U. Horne, another director of the company. He appeared in the latter part of January, 1866, shortly before the day of sale, commissioned by the holders of a large number of the mortgage bonds (nearly three hundred) to have the railroad sold and purchased by a trustee or trustees, to be selected by the bondholders and creditors of the company, in which class the preferred shareholders might be placed; a new company to be formed of the purchasers upon a basis to be previously agreed upon and signed by the several interests, the bondholders to be placed in the class of preferred shareholders, and the other creditors and preferred shareholders to have common stock. This plan proposed the extinction of common stock and the creation of a new mortgage for the purpose of repairing and stocking the road. Horne's commission was in writing. On his way to Monroe he met Gordon in New Orleans, and there learned for the first time that proceedings had been instituted to bring the property to sale. Gordon then proposed to him to unite his interests and those of his constituents with those of the party in Monroe, namely, the party that had combined to purchase the property. Upon Horne's arrival at Monroe he had several interviews with Ludeling, and it appears that he endeavored to procure a postponement of the sale, representing that Gordon had consented to such postponement. To this Ludeling replied that Gordon had no authority to make such an offer or consent. Considering that Ludeling was then a party to, and the active agent of, the combination that had been formed, this reply is most remarkable. It shows that the confederacy had then the control of the executory process and of the sale, and that the directors of the company had put themselves in the position of both sellers and buyers of the property they held in trust; for if Gordon had no authority to consent to the postponement of the sale, it must have been because of his arrangements with the directors. But, passing this by, after many propositions, Horne was persuaded by Ludeling, and without any communication with his constituents, to enter into an agreement,

which was made on the 2d of February, 1866, one day before the sale. The material part of this agreement was that Gordon, Ludeling, Baker, Stubbs, Waddell, and John Ray, of the first part, and Horne, of the second part, *for himself and friends*, should club their funds to buy the property of the Vicksburg, Shreveport, and Texas Railroad Company, advertised for sale on the morrow, in partnership, and, if the property should be bought by them, that the party of the first part should own two-thirds, and the party of the second part should own one-third. The agreement reveals apprehension that the sale might be stopped by injunction, or declared null and void. It was signed "John T. Ludeling, for himself and friends," and "J. U. Horne, for himself and friends," and it is proved that when it was entered into Ludeling was informed of Horne's mission and of the plan he was instructed to carry out.

It is impossible to characterize this agreement as anything else than fraudulent. Its obvious purpose was to remove competition at the sale. It was a flagrant breach of trust on the part of Horne, and it was a fraud in Ludeling, with knowledge of the trust Horne had undertaken, to persuade him to violate his instructions and sacrifice the interests of his constituents, himself becoming a party to the violation.

Such were the combinations organized, and such was the object of the combinations, when the day arrived on which the sale had been advertised to be made. This large property was about to be sold for a claim of $720, at a village remote from the residence of the great body of those most interested in it. It must have been known that notice of the sale in all probability had not reached those parties. Their agent, sent to protect their interest, had been tampered with and overcome. Not one of the defendants, who were residents at Monroe and directors of the company, who had combined to become purchasers at the sale, and not one of those who subsequently united in the purchase and became directors of the new company, not even Bry himself, the vice-president, had lifted a finger to stay the

sale. or, so far as appears, had requested any delay, or had made any effort to prevent the probable sacrifice of the property; and when Mr. Garrett, a lawyer and resident stockholder at Monroe, obtained an injunction against the sale, he was bought off by the payment of $2500 for common stock, confessedly not worth a cent, yet taken at its par value, and he was required to stipulate that he would take no fee from, or in any manner counsel or advise, either directly or indirectly, any person who might desire to attack the sale. This arrangement was negotiated by Baker, and the money was paid by Ludeling. We have already noticed the appraisement made after ten o'clock on the morning of the sale by two persons appointed by Gordon and Bry. Of its character we propose to say little more. Manifestly it had been prepared before the appraisers were selected. It was conveniently low to enable the associates to purchase for a sum almost nominal, and one of the appraisers at least was appointed by a person who had combined with others to become a purchaser, and who was, consequently disqualified from selecting an appraiser, or, certainly, was unfit to make such a selection.

Everything having been thus prepared the sale proceeded, but the scheme of the associates was at first deranged by the interference of other bidders, Branner & Co., who bid for the property $550,000, more than seven times the amount of the appraisement, and to whom it was first struck off. Then ensued what we must regard as a most remarkable effort to prevent an adjudication to these bidders and an acceptance by the sheriff of their bid. Ludeling, for himself and his associates, and acting as their chief agent, presented one hundred and fifty-four of the mortgage bonds, four of which were Gordon's, one Bry's, and most, if not all, the remainder obtained from Horne, and demanded immediate payment of the past-due coupons. He had no right to make such a demand. He knew the bonds had been placed in Horne's hands for other purposes. He knew that it was a breach of faith in Horne to allow them to be thus used, and a fraud upon their owners thus to use them.

Stubbs presented seventy-two coupons taken from other bonds, and also demanded immediate payment. And he had no authority to make such a use of those coupons. They had been placed in his hands for another purpose, which failed, and their owners had directed them to be returned. Bry also had one bond, and he presented it with its coupons. This one bond, with the four of Gordon, were all that there was any authority to present. Yet the confederates, taking advantage of Horne's breach of trust, and of Stubbs's unauthorized act, were enabled to present the coupons of one hundred and fifty-four bonds, and part of the coupons of thirty-six other bonds, for immediate payment. The sheriff joined in the demand, and, because Branner & Co. were unable at once to pay this unauthorized claim, he set up the property again immediately for sale, when it was struck off, on Ludeling's bid of $50,000, to the persons we have named. This was on Saturday, late in the afternoon, and on the Monday next following the sheriff's deed was delivered, but the bidders, though receipting in part to each other, have still in their hands the whole of their bid except $468.75, the amount of costs paid to the sheriff.

Thus directors of the company, owing duties to its stockholders and creditors, not only combined to obtain the company's property for themselves at a sacrifice, through the formality of a judicial sale, but were active participants in successful efforts to defeat a sale for $550,000 in order that they might become the purchasers for $50,000.

It is impossible to sustain such a transaction. Throughout it was grossly inequitable. That the property was sacrificed by means of an unlawful and widespread combination is abundantly proved, and that the directors who were parties to it, and who became the purchasers, were guilty of an inexcusable violation of confidence reposed in them admits of no doubt. Ludeling, it is true, was not a director, but he was a leading member of the combination and its chief agent to carry out its plans. He knew its purposes. He knew its illegality. He had negotiated the surrender of Horne, with full knowledge of Horne's breach of trust. He assumed the

control of Gordon's executory process, and, as we have noticed, when told that Gordon had consented to stay the sale, he declared that Gordon had no power to do it. Indeed, Ludeling appears to have had complete possession of the sheriff. He drew up the sheriff's return, carefully stating in it that all the requirements and formalities of the law had been complied with in the second offering as they had been in the first, and he was, as the evidence shows, most active in defeating an adjudication to Branner & Co. on their large bid.

The connection of Stubbs and Waddell with the combination we have already sufficiently shown, and it is not claimed that the other defendants, Crossley and Phillips, are anything more than volunteers. They have paid nothing. The sheriff adjudicated the property to them, and his deed was made to them, in common with others, but it is proved that their interest is only nominal, each having had one share given to him. They were introduced to enable the confederates to carry out their scheme. Pincaird, according to his own statement, was a party to the agreement of February 2d, 1866, between Ludeling and his friends, and Horne and his friends. He was therefore one of the parties to the unlawful combination.

The defendants can take nothing from such a sale, thus made. Were we to sustain it, we should sanction a great moral and legal wrong, give encouragement to faithlessness to trusts, and confidence reposed, and countenance combinations to wrest by the forms of law from the uninformed and confiding their just rights.

No words need be expended to show that the defence of the new company, the North Louisiana and Texas Railroad Company, must fall with that of the other defendants. The new company was formed by the purchasers at this illegal and void sale. It was organized while this suit was pending, and it has no other title than that of these purchasers.

It remains only to consider the effect of the judgment in the monition suit instituted by these defendants on the 21st

day of April, 1866.   They contend that the judgment of homologation rendered in that suit conclusively establishes the validity of the sale made to them, and bars the present bill.   But we think such is not the effect of the judgment. The proceeding to homologate a sheriff's sale is peculiar to Louisiana.   It is authorized by an act of the legislature passed March 10th, 1834.*   That act authorizes purchasers at a sheriff's sale to apply for a monition to all persons interested who can set up any right, title, or claim to the property described in consequence of any *informality* in the order or decree, or judgment of the court under which the sale was made, or any *irregularity or illegality in the appointment and advertisement in time or manner of sale*, or for any other defect whatsoever, to show cause why the sale should not be confirmed and homologated.   If no cause be shown, the judgment of confirmation in the case is conclusive upon the world.   But conclusive of what?   Conclusive that there have been no fatal informalities, or irregularities, or defects; we think of nothing more.   The act has relation to mistakes or omissions of the officers of the law.   But there is nothing in it which authorizes an inquiry into or an adjudication upon questions of fraud; nothing which concludes the question whether the purchasers have obtained their title by fraud, or whether they are trustees *malâ fide* for others.   And such has been the ruling of the Louisiana courts.   In *The City Bank* v. *Walden,*† the court considered the effect and scope of the act.   "It was passed," they said, "for the protection of *bonâ fide* purchasers at judicial sales from litigation concerning matters of form, a non-observance of which frequently exposed purchasers to unreasonable and vexatious suits.   The difficulty of administering and preserving proofs of the observance of formalities was, in the hands of the unscrupulous, the instrument of great annoyance and expense to those who had purchased and paid for property exposed to sale under the authority of our courts.   We do not under-

* Revised Statutes, title Monition, sections 2374 to 2380.
† 1 Louisiana Annual, 46.

stand the operation of the act to extend beyond the matters of form, nor that it purports to operate upon matters 'dehors' the record." This is manifestly the true construction of the statute, and it is quite consistent with the enactment that the judgment of homologation is to be received and considered as "full and conclusive proof that the sale was duly made according to law, in virtue of a judgment or order legally and regularly pronounced on the interests of the parties duly represented." Fraud and trust are entirely outside the record. A sale may have been conducted legally in all its process and forms, and yet the purchaser may have been guilty of fraud, or may hold the property as a trustee. In this case the complainants rely upon no irregularity of proceeding, upon no absence of form. The forms of law were scrupulously observed. But they rely upon faithlessness to trusts and common obligations, upon combinations against the policy of the law and fraudulent, and upon confederate and successful efforts to deprive them wrongfully of property in which they had a large interest, for the benefit of persons in whom they had a right to place confidence. Homologation is no obstacle to such a claim.

JUDGMENT REVERSED.

## DECRETAL ORDER.

1. This cause came on for argument and was argued by counsel. Whereupon, after due consideration, it is ordered, adjudged, and decreed, that the decree of the Circuit Court dismissing the bill of the complainants be reversed and set aside, and that the bill be reinstated.

2. And it is further ordered and decreed and hereby declared, that the mortgage described in the bill, executed to John Ray or bearer, is still a valid lien upon all the property described therein not sold or disposed of by the Vicksburg, Shreveport, and Texas Railroad Company before December 23d, 1865, and the rights of the holders of bonds *bonâ fide* issued under the mortgage are hereby set up and maintained, and the holders

are authorized to prove their bonds under the decree of this court or of the Circuit Court.

3. And it is further ordered, adjudged, and decreed that the sale made to John T. Ludeling and his associates, and the adjudication of the sheriff to them, together with the sheriff's deed to them, be declared to be fraudulent and void, and be set aside and cancelled, and that a perpetual injunction issue commanding them and all the defendants to refrain from setting up or claiming any right, title, or interest under said sale or under said deed, and also commanding them, their agents and servants, to refrain from selling or otherwise disposing of any of the property, rights, credits, privileges, or effects covered by or embraced within the mortgage made by the said The Vicksburg, Shreveport, and Texas Railroad Company.

4. And it is further ordered, adjudged, and decreed that this cause be remitted to the Circuit Court for the District of Louisiana, with instructions to direct an account to be taken of all the property of the said corporation and to appoint a receiver thereof; and, also, to order that the property described or mentioned in the said mortgage be sold, under the direction of that court, for the benefit, first, of all the *bonâ fide* bondholders secured by the mortgage; and, secondly, for the benefit of other creditors of the company and its stockholders, upon such terms as may appear best calculated to promote the interests of all.

5. And it is further ordered and decreed that the defendants do account for all money and property received by them out of the property so sold to them or any of them, or from its profits or income, receiving in their account such credits as, under the circumstances of the case, by the law of Louisiana, they are entitled to, and that they pay and deliver to the receiver whatever on such accounting may be found due from them.

And it is ordered and adjudged that the defendants do pay the costs in this court and in the Circuit Court.

LET A FORMAL DECREE BE PREPARED.