# W. W. Kurtz, Appellant, *v.* The Philadelphia and Reading Railroad Company and J. Pierpont Morgan, George S. Bowdoin, George C. Thomas, Edward T. Stotesbury, Charles H. Coster, Robert Bacon, James W. Paul, Jr., J. Pierpont Morgan, Jr., Temple Bowdoin and Edward M. Robinson, copartners, trading together under the firm name of J. P. Morgan & Co.

*Corporations—Mortgage—Judicial sale—Fraud.*

While a court of equity has jurisdiction in a collateral proceeding to set aside a judicial sale made under a decree of another court, which had been obtained by fraud, it will not interfere where there are no averments of fact in the bill which would warrant the inference of fraud in obtaining the decree under which the sale was made.

On a bill in equity filed in the court of common pleas by a general creditor of a railroad company against the company and a firm of bankers who were depositories of a fund raised under a reorganization plan, it appeared from the bill that the company had defaulted on all of its securities, and had been in the hands of a receiver appointed by a federal court for several years. The trustee in one of the mortgages began foreclosure proceedings in the circuit court, which were opposed, but resulted in a decree directing the trustee to sell the property covered by the mortgage, and the receivers to sell all the other property. The purchasers at the sale were a reorganization committee of the security holders. It appeared that the security holders who were thus represented had openly announced their scheme, had invited all who were interested to join, had secured sufficient assents and money, and after the sale had organized a new company. Plaintiff averred in his bill that the decree authorizing the sale was the result of an agreement between the corporation, the receivers

and the security holders, and that such an agreement was in fraud of his rights. The plaintiff did not participate in the reorganization plan. The bill prayed that plaintiff's claim should be paid out of the fund raised by the reorganization committee. *Held*, that the bill was properly dismissed on demurrer.

Argued March 29, 1898. Appeal, No. 437, Jan. T., 1897, by plaintiff, from decree of C. P. No. 2, Phila. Co., Sept. T., 1896, No. 408, dismissing bill in equity. Before GREEN, McCOL-LUM, MITCHELL, DEAN and FELL, JJ. Affirmed.

Bill in equity for an account.

The facts appear by the opinion of the Supreme Court.

*Error assigned* was in sustaining demurrer and dismissing the bill.

*Silas W. Pettit*, for appellant.—The property of an insolvent corporation becomes, upon insolvency, a trust fund for the payment of its debts: Montgomery Web Co. v. Dienelt, 133 Pa. 585; R. R. v. Howard, 7 Wall. 392.

This is not the case of an ordinary railroad foreclosure.

The right of the mortgagees cannot extend beyond the property mortgaged, and the right of the receiver must necessarily have the same limitation: Gluck & Becker on Receivers, sec. 66; Scott v. Farmers' L. & T. Co., 69 Fed. Rep. 17; Harland v. Bankers' & M. Tel. Co., 32 Fed. Rep. 305; Smith v. McCullough, 104 U. S. 25; Penna. Co. v. Phila. & Reading R. R., 69 Fed. Rep. 482.

The principle is that, until the mortgage creditor takes possession by his trustee or a receiver, the whole net earnings and income of the property belong to the company, and are to be applied among all its creditors; but when the mortgagee has entered into possession, then the net earnings and income from the mortgaged property is to be applied to the interest on the mortgaged debt: Blair v. St. Louis, H. & K. Ry., 25 Fed. Rep. 232; Sage v. R. R., 125 U. S. 378; Cent. T. Co. v. Rolling-Stock Co., 56 Fed. Rep. 5.

This appropriation, effected as it was by the agreement of the creditors and debtor, was a fraud on the appellant and other general creditors of the Philadelphia and Reading Railroad

Company: Farmers' L. & T. Co. v. San Diego St. Car. Co., 45 Fed. Rep. 518; Graham v. La Crosse & Mil. R. R., 102 U. S. 148; Wabash, St. L. &. P. Ry. v. Ham, 114 U. S. 587; R. R. v. Howard, 7 Wall. 392; Montgomery Web Co v. Dienelt, 133 Pa. 585; Pa. Transportation Co.'s App., 101 Pa. 576.

That the forms of a judicial sale were used to effect the transfer does not validate the transaction, if otherwise invalid: Sage v. Cent. R. R., 99 U. S. 334; Canada Southern Ry. v. Gebhard, 109 U. S. 527; Biddle v. Tomlinson, 115 Pa. 299.

If one deliver money or personal property to another under the promise of the latter to deliver it over to a third person who has a beneficial interest therein, such third person can maintain an action therefor against the promisor: Guthrie v. Kerr, 85 Pa. 303; Wynn v. Wood, 97 Pa. 216; Drake v. Phila. & Reading R. R., 21 W. N. C. 122; Adams v. Kuehn, 119 Pa. 76; Delp v. Brewing Co., 123 Pa. 42.

The remedy sought by the bill is a proper one: 2 Lewin on Trusts, sec. 613; Bound v. Ry. Co., 50 Fed. Rep. 853; Perry on Trusts, sec. 511; Nickisson v. Cockill, 3 DeG. J. & S. 622; Greenough v. Welles, 10 Cush. 571; Colton v. Colton, 127 U. S. 300.

*John G. Johnson*, for appellees.—The decree of the United States circuit court ordering the sale of the premises and the action of the receivers in taking possession of the assets of the railroad and of the coal and iron companies, in administering the receivership, and in distributing the proceeds derived from the sale of the assets in their hands, were proper, and, whether proper or improper, in no event can the same be reviewed here, under any allegations made by the bill.

The plan of reorganization was legal: Penna. Trans. Co.'s App., 101 Pa. 575.

There was no appropriation for the appellant's benefit of the stockholders' contributions under assessments. There was no provision for a contingent fund out of bonds and shares to be created by the new company, applicable to the payment of the indebtedness of the railroad company or of its stockholders.

*Silas W. Pettit*, in reply.—A court of equity has jurisdiction to entertain a bill averring that a conveyance, by means of a

judicial sale, under a decree of another court, was in fraud of the complainant's rights, and to afford him such relief as will protect or restore his rights, notwithstanding the forms of law were scrupulously observed; and without assuming to control, supervise or annul the proceedings of such other court, it may by its decree lay hold of the parties and compel them to do that which, according to the principles of equity they ought to do, and thereby secure and establish the rights of the plaintiff: Arrowsmith v. Gleason, 129 U. S. 86; Jackson v. Ludeling, 21 Wall. 616; Gaines v. Fuentes, 92 U. S. 10; Barrow v. Hunton, 99 U. S. 80; Johnson v. Waters, 111 U. S. 640; Marshall v. Holmes, 141 U. S. 589; DeNeufville v. N. Y. & N. Ry. Co., 81 Fed. Rep. 10; Farmers' L. & T. Co. v. N. Y. & Northern Ry. Co., 150 N. Y. 410.

OPINION BY MR. JUSTICE DEAN, July 21, 1898:

In February, 1893, the Philadelphia & Reading Railroad Company having defaulted in its interest on its third preference income mortgage bonds, a bill was filed by Thomas C. Platt, in the circuit court of the United States for the eastern district of Pennsylvania, averring insolvency of the company, and praying for the appointment of receivers for all the real estate and personal property of the company. Upon due consideration, the court appointed receivers, who entered into possession of all the property of the company, whether covered by the mortgage or not, and proceeded to operate the property under the direction of the court. This receivership was not disturbed until March 2, 1895, when the Pennsylvania Company for Insurance on Lives and Granting Annuities, trustee under what was known as the general mortgage, filed its bill against the company, Thomas C. Platt, complainant in the first bill, and the receivers appointed on that complaint, for the foreclosure of the general mortgage. This bill averred the receivership, and that under it the receivers had taken possession of all the property, real and personal, of the railroad company; that the interest on the general mortgage had been in default since the appointment of the receivers; that, as provided in the appointment of trustee, more than three fourths of the holders of outstanding bonds secured by said mortgage had demanded that the trustee should proceed to foreclose the same; therefore

it prayed for a decree of foreclosure. Demurrers were filed by the railroad company and junior bondholders, which were overruled by the court. Subsequently answers were filed by the railroad company and junior bondholders, which, while admitting nearly all the important averments of the bill, denied several of them. The matter was referred to Henry C. Loughlin, Esq., as examiner, to take testimony and report the facts; he filed his report on February 5, 1896. Notice was then given to parties in interest that a decree of foreclosure would be applied for on May 1, 1896. This decree, after argument, was made, and the mortgaged property ordered to be sold by the trustee; also, a further decree was entered that the receivers, after due notice, should sell all the assets of the company of every nature and description not embraced in the lien of the general mortgage. Further, in same decree directing the appropriation of the proceeds of the sale, among others, this order was made: "It is further ordered, adjudged and decreed that all claims and equities of the Philadelphia, Reading & New England Company and the holders of its bonds and shares be and the same are hereby reserved for further consideration." It was further, in same decree, ordered that any holder of indebtedness, obligation or liability might at any time apply to the court at foot of decree for modification thereof or for further relief.

Under these decrees the property covered by the general mortgage was sold by the trustee, and all the other assets, real and personal property, by the receivers, to Charles H. Coster and Francis L. Stetson, on September 23, 1896, for a sum aggregating $20,500,000. After due notice, the sales were confirmed by the court on October 3, 1896.

The purchasers were representatives of a reorganization committee of security holders of the railroad company and of the Reading Coal & Iron Company, who, in view of the imminence of foreclosure and sale of the property of both companies, prepared a scheme of reorganization which involved the purchase of both properties. The scope of the plan, as announced by the originators on December 14, 1895, to the different classes of creditors, was: 1. To protect the present general mortgage. 2. The reduction of fixed charges to a limit safely within the net earning capacity of the reorganized properties. 3. Adequate provision of cash working capital for future requirements.

4. The payment of the floating debt and provision for existing car trust obligations. 5. Such control of the reorganized system until the earnings of the properties shall have placed them, in a satisfactory financial position, as shall render additionally secure, a new general mortgage.

The details, it was stated, in connection with this outline of the scheme, had been prepared with the co-operation of J. Pierpont Morgan & Company, who had been selected by the committee as managers to carry out the plan. After the sale, the reorganization under the proposed scheme was carried out, and a new company formed and chartered, called the Philadelphia & Reading Railway Company; also a new coal company, to which was given the name of the old coal company. The new company was to be capitalized at the sum of $254,000,000. Of this, $114,000,000 was in four per cent general mortgage bonds; first preferred stock, $28,000,000; second preferred stock, $42,000,000, and common stock $70,000,000. The proceeds of the bonds were to be applied to the undisturbed bonds, the then existing general mortgage bonds, and to the future needs of the new company; first preferred stock, $7,184,000, to old first income bonds; to syndicate, $8,000,000; to adjustment of outstanding bondholders, creditors, commissions to guarantee syndicate, and all surplus to belong to new company, $12,816,000. The remainder, second preferred and common stock, was to be apportioned among those security holders of the old company, who had surrendered their securities and assented to the plan. No part, however, it was expressly stipulated, was to be apportioned to those who had not assented to the plan. As an inducement to assent, it was stated by the committee that the securities of the new company were issued on and have as security a large amount of property not covered by the old general mortgage.

In the bill before us, W. W. Kurtz, the plaintiff, is a bondholder of the Philadelphia, Reading & New England Railroad, and holder of some of the bonds on that railroad secured by a mortgage for $7,250,000, a large part of which bonds are still outstanding, and default made in the interest. The old Philadelphia & Reading Railroad Company before its insolvency obtained by contract the control of the stock and organization of this road, and by the same contract guaranteed the princi-

pal and interest of these bonds.   The mortgage on the property
of the old Reading in no way bound any interest or property
it had in the Philadelphia, Reading & New England, and it
follows that the sale by the trustee in the foreclosure pro-
ceedings passed no property of the old company in this road of
which it held the stock.   The earning capacity of this and
other roads, aggregating 448 miles not covered by the general
mortgage, is stated by the reorganization committee to be
$558,000 net, annually.

The holders of bonds of the Philadelphia, Reading & New
England Railroad argue that they are in equity entitled to
share in the $12,816,000 reserved by the reorganization com-
mittee out of the first preferred stock of the new company,
which, to use the committee's own language, is reserved " for
adjustment with various outstanding bondholders, creditors and
stockholding interest, commission to refunding and guarantee
syndicate and contingencies (all surplus to go to the new com-
pany)."   The purchase price at the sale was $20,500,000.
There was received from junior security holders, who joined in
the reorganization, assessments in cash and securities amount-
ing to $24,911,793.60.   The plaintiff avers that the default in
the interest of the old general mortgage of the company, and
the decree of foreclosure and order of sale to trustee and re-
ceivers, made in consequence thereof, were procured and assented
to by the managers of the railroad company and the parties
interested in the reorganization, for the purpose of bringing
about a sale of all the property of the company regardless of
the lien of the mortgage ; that the board of managers of the
railroad company, who ought to have controlled the legal pro-
ceedings in the interests of the stockholders, in fact assented
to these proceedings which were in the interest of those con-
cerned in the reorganization ; that the general creditors, upon
the insolvency of the company, had a general lien upon all the
assets not subject to the lien of the mortgage, and had a right
to such assets pro rata ; that any agreement having the object
or effect of hindering or delaying them in the assertion of such
right was a fraud in law upon such creditors ; that the plan of
reorganization and agreement thereunder, which were promoted
by the decrees of sale, were not for the benefit of the creditors,
but inured to the benefit of those concerned in the reorganiza- ·

tion ; that the decrees, though in form judicial, were in fact
the result of agreement between only apparently hostile par-
ties, having in view the same purpose, that of transferring the
whole property of the company to the new owners through the
medium of a judicial sale ; that attainment of this purpose was
a fraud upon the plaintiff, and that the form of a judicial sale
did not validate the transaction.

The plaintiff, while asserting his right, if he so chose to pre-
fer his claim against the new company, nevertheless, prefers to
enforce his equity against that portion of the fund raised by
assessment and new securities still undistributed in the hands
of J. Pierpont Morgan & Company, the managers of the new
company.   He therefore prays :  (1) That the amount of his debt
be ascertained and decreed ; (2) that the amount of assessments
and securities of the new company in the hands of defendants
applicable to the payment of his debt be ascertained ; (3) dis-
covery of the persons to whom, and on what account, J. Pier-
pont Morgan & Company have paid or agreed to pay the
$24,911,793.60 ; (4) that they be decreed to pay over to plaintiff
and all other unsecured creditors of the Philadelphia & Read-
ing Railroad Company who may join in the suit such propor-
tion of the fund and securities as remain in their hands, subject
to proper reductions ; (5) that they be enjoined from making
delivery to any of the assenting security holders, any stock of
the new company, until the amount due plaintiff and other
unsecured creditors be paid or secured under the direction of
the court.

Defendants demurred to the bill, because : (1) The averments
do not entitle him to the relief in equity sought for ; (2) there
is an adequate remedy at law for the cause of action averred ;
(3) the cause of action averred is not cognizable in a court of
equity ; (4) the bill is bad for multifariousness.

The court below, without filing opinion, simply sustained the
demurrer, and dismissed the bill, hence this appeal, assigning
for error the decree of the court.

We assume, as maintained by appellant, that the obligation
of the Philadelphia & Reading Railroad, in its contract with the
New England Railroad, was that of a surety, and not of a guar-
antor, and embraced the time of payment, as well as of the
amount.   It is needless to say, that we also adopt the familiar

equity rule that defendants, by resting their case solely on their demurrer, admit the facts averred by plaintiff. But we also remark, that they do not by demurring admit other than the reasonable inferences to be drawn from the facts, and do not admit to be correct the legal conclusions drawn by plaintiff therefrom. And it is clear that the Pennsylvania Company, as trustee, either with or without decree, could not make sale of any of the property not bound by the lien of the mortgage; but this it did not attempt to do. It will be noticed, however, that the Platt bill filed February 20, 1893, in behalf of himself and other holders of what were known as the third income mortgage bonds, averred insolvency, and that fact was adjudicated against the company and receivers appointed for the entire property, real and personal. By the terms of the decree every dollar's worth of the property went into the possession of the receivers to be administered for the benefit of all the creditors according to their legal rights and equities; from the moment it was made, all the property of the company, mortgaged and unmortgaged, was in custodia legis. Necessarily, whatever property the Reading Company had by its contract with the New England Company also went into the custody of the court. Whatever was done with it afterwards, whether it was operated or sold, while that first adjudication and decree remained in force, was done by the court. It was operated by the court for over three years, when the bill of the Pennsylvania Company, as trustee, was filed; then this bill, as also the former adjudication and decree being before the court, having been in the possession of and the operator of all the property for years, thus having full means of knowledge of its character and possibilities, at the same time knowing its hopeless insolvency, as well as the character and amounts of the different debts and obligations; under these circumstances, after due notice to all interested, the decrees for sale and those of confirmation were made. The court knew all the material facts necessary to the proper moulding of the decrees as well as, if not better than, most of those interested; it was blinded by no prejudice or sympathy; nor was it warped by self-interest. In the decrees the rights and equities of all the creditors were expressly guarded; this plaintiff, by name of his securities. Taking the record as it stands, the jurisdiction of

the court over the property which is the foundation of plain-
tiff's debt is established beyond doubt.

How could there have been such imposition on or conceal-
ment from the court as made the decree, as between the parties,
collusive or fraudulent, and therefore void? It has been held
in this state, at least since Jackson v. Summerville, 13 Pa. 359,
that where palpable fraud enters into a judicial decree it is
coram non judice as to the parties defrauded, and as to them, even
in a collateral proceeding, will not be enforced. The same
point was decided in the cases cited by appellant, (Biddle v.
Tomlinson, 115 Pa. 299 ; Arrowsmith v. Gleason, 129 U. S. 86 ;
Jackson v. Ludeling, 21 Wall. 616), and the federal courts
have frequently asserted their right, as to the parties defrauded,
to set aside collaterally judicial sales made by decrees of state
courts, where such decrees were obtained by collusion and
fraud: Barrow v. Hunton, 99 U. S. 80 ; Marshall v. Holmes,
141 U. S. 589, and other cases. We are not disclaiming a
power to interfere and enforce the equity of a third party not
bound by the decree, but where is the averment of facts which
warrants the inference of fraud to obtain this decree? It will
be noticed that there had been four defaults in interest on the
general mortgage prior to March 2, 1895 ; on that day the
trustee filed its bill for foreclosure ; then demurrers were filed
which were overruled ; then answers, and an examiner was
appointed ; on December 14, 1895, while the matter was pend-
ing before him, the holders of millions of the securities took
steps looking to a possible purchase of the property and a re-
organization ; with notorious default on every fixed charge for
years, they knew the company was hopelessly insolvent ; the
mortgage which was pressing for foreclosure covered but part
of the property ; a severance by separate sales would almost
inevitably depreciate its value ; the plaintiff himself avers that
the mortgage did not include 448 miles of road intimately con-
nected with the main line, with most valuable traffic contracts
and privileges. The holders of the imperiled securities could
not wait for a final decree before moving, for, from the very
nature of the business, time to perfect the plan and secure
money for the prospective bid was necessary. They organized,
openly announced their scheme, on its face fair, invited all who
were interested to join ; secured sufficient assents and money

and, after the decree was made, purchased the whole property at public sale and reorganized. Of course, they wanted the property offered, so that it could be purchased as a whole; it was the system they intended to reorganize, not a piece of it. The court, having had in its possession for years the whole property, agreed in opinion with them. It is utterly immaterial whether the managers of the corporation or the court's officers, the receivers, agreed with them or not; whether it was best for all the creditors that it should be sold so that it might be purchased as a unit to preserve the system intact, or should be broken up and sold separately, was for judicial consideration and decree. The court, after its knowledge of and experience with the property, with the findings of facts by its own appointee, could not have been imposed on by any merely assumed, yet not real, attitude of the parties. Taking every averment of fact in the bill to be true, we can discover no evidence, either explicit or inferential, of fraud. That a part of the whole number of creditors may join in the purchase of their debtor's property at a judicial sale, then mortgage, improve and operate it for their mutual benefit, is not doubted. How does an antecedent agreement to do a perfectly lawful act render it fraudulent? A combination to obtain a decree which would depress the price or deter bidders, or to deceive the court by the suppression of material facts and induce it to make a decree favorable to their purpose, which, if all the facts had been known, would not have been made, is a wholly different agreement, and is fraudulent. No such agreement as the latter, on the facts here averred, was made.

As to the averment of wrongful diversion of income during the receivership, we have no jurisdiction, and are not reviewing the proceedings of the circuit court on appeal, and, therefore, have nothing to do with it. The complainant must seek to right his alleged wrong in this particular in the court which authorized it, or in the appellate tribunal of that court.

If, in the absence of fraud, appellants have any equitable claim to any portion of the fund in hands of defendants, he must press his claim in the court which has taken and exercised jurisdiction over the property. We can only say that there is no fraud or collusion here shown, which authorizes us to disregard this judicial decree; we cannot touch it, nor the

property purchased by defendants in pursuance of it, nor the new securities issued by the purchasers upon it, after they acquired title.

The decree of the court below is affirmed.