**G. W. HOPPER, Trustee, and Mary Lou Chadderdon, cestui que trust, Appellants,**

v.

**The AMERICAN NATIONAL BANK OF CHEYENNE, WYOMING, Trustee in Bankruptcy, Appellee.**

**In the Matter of SMITH–CHADDER-DON BUICK, INC., Bankrupt.**

**No. 6911.**

United States Court of Appeals
Tenth Circuit.

Sept. 14, 1962.

Brooke Wunnicke, Cheyenne, Wyo., for appellants.

James A. Tilker, Cheyenne, Wyo. (Carleton A. Lathrop, Cheyenne, Wyo., on the brief), for appellee.

Before MURRAH, Chief Judge, and PHILLIPS and SETH, Circuit Judges.

SETH, Circuit Judge.

■ This case concerns the claim in a bankrupt estate based upon a note and mortgage which arose under the following circumstances: In 1957, Carlin Smith and D. G. Chadderdon owned the outstanding stock in Smith-Chadderdon Buick, Inc., and in September of that year they entered into an agreement whereby Chadderdon agreed to buy Smith's 51% or 510 shares of stock in the corporation for $45,000.00 and payment of a $5,000.00 note which the corporation owed to Smith. The sale was completed on October 4, 1957, at which time Smith endorsed his certificates of stock in blank and delivered them to Chadderdon. Chadderdon paid $15,000.00 on the purchase price of the stock and $5,000.00 in payment of the company note owed to Smith. The balance of the purchase price was represented by a promissory note signed by the corporation (D. G. Chadderdon as president, Mary Lou Chadderdon as secretary-treasurer) and by Mr. and Mrs. Chadderdon individually. This is the note on which the claim is based. Also as part of the agreement Smith required that there be given to him a chattel mortgage covering all of the equipment, parts and accessories of the corporation. This was done, and it was signed by Mr. and Mrs. Chadderdon as corporate officers. Smith also required that there be pledged to him all of the outstanding shares of stock in the corporation including those already owned by Chadderdon. At the closing of the sale Smith was informed that a portion of the 510 shares of stock sold would go to the corporation and be cancelled. This was done and the corporate minutes show that the corporation bought 382 shares from Smith and they were cancelled. The minutes also authorized the execution of the note and chattel mortgage.

The evidence shows that Smith required the chattel mortgage on the corporate assets in order to keep them intact should he have to take over the stock under the pledge, and also to prevent any claims by creditors or third persons from attaching to these corporate assets. The transaction contemplated that if Smith was paid in full, all of the outstanding shares of stock would be owned by Chadderdon and if he was not paid Smith would have all the shares.

The corporation had a Buick dealer's franchise and on July 18, 1957, made application to General Motors Acceptance Corporation for a loan which was approved and the money was advanced on August 30, 1957. The loan agreement provided that the corporation not pledge, mortgage or create liens against the corporate assets. This agreement was signed by Smith as president and Chadderdon as secretary-treasurer of the corporation. There was also testimony that certain tax advantages to the individuals were expected so long as the corporation appeared as a maker of the note.

On February 18, 1959, Chadderdon died and the business was temporarily closed. In March 1959 Smith demanded payment of the note from Mrs. Chadderdon individually as a co-maker and she so paid him the amount then due and the note was endorsed without recourse by Smith to George W. Hopper who was her representative. The mortgage was likewise assigned and the stock certificates held under the pledge agreement were delivered to Mrs. Chadderdon thereby giving her full control of the corporation. At approximately this same time, the company received the proceeds of a life insurance policy on the life of Chadderdon, and on April 30, 1959, these checks were endorsed by Mrs. Chadderdon as president of the corporation to George W. Hopper, her representative, in payment of the note in question. Hopper then executed a release of the mortgage and delivered it to the company. On the same day petition and schedules in bankruptcy were prepared for the company

and signed by Mrs. Chadderdon as president. On May 1, 1959, the company filed its petition in bankruptcy.

The trustee in bankruptcy demanded the return from Hopper of the corporate funds used to pay the note, and the money was returned. Mrs. Chadderdon and Hopper filed a secured claim in the bankruptcy estate based on the entire balance of the note and mortgage. The referee found that the note was not valid, that the Chadderdons caused the corporation to execute the chattel mortgage in order to provide to Smith certain security demanded by him in what was in reality a personal transaction between the Chadderdons and Smith. The referee also found that the execution of the mortgage was in violation of the agreement between the company and GMAC which prohibited the creation of liens on company assets. The trial court confirmed the referee's decision and claimant took this appeal.

The evidence shows that the parties to the transaction intended that the note and mortgage be not enforced against the corporation and that they not be corporate obligations. They intended instead that the corporation be a co-maker on the note only to provide some apparent validity to the mortgage which was signed by the corporation to assist a personal transaction between stockholders, and to protect for a stockholder the corporate assets from the claims of third parties. The referee found:

"That the disputed note and mortgage were never intended to represent an obligation of the Bankrupt corporation, but were executed and signed by the corporation and the mortgage recorded for the sole purpose of assuring to Smith that if he was not paid for the stock he sold to Chadderdon and had to take over the corporation under the stock pledge, the key assets of the corporation would be unencumbered and available to Smith; and * * *."

As we have seen Mrs. Chadderdon, the claimant, signed the mortgage as an officer of the corporation and the note as an officer and as an individual interested in the purchase of the shares of stock owned by Smith. Smith was an officer of the corporation when the note and mortgage were signed but apparently resigned that same meeting. Thus there were corporate officials and directors on both sides of the note and mortgage transaction. The claimant here also holds the mortgage and note by assignment from Smith. The intention of the parties under these circumstances is certainly controlling on the enforceability of the note and mortgage against the corporation by the claimant.

The GMAC agreement not to mortgage was signed by Smith and by Mr. Chadderdon as corporate officers. It was binding on the corporation at the later time when Mrs. Chadderdon signed the note and mortgage to Smith. The claimant is again on both sides of this transaction. She became a corporate officer after the date of the GMAC agreement, but it must be remembered that she signed the note and mortgage in question only thirty or forty days after the advance of funds under the GMAC loan agreement. Under these facts, she as a corporate officer and as an individual must be held to have knowledge of the prohibitions in the agreement as did Smith. The intention that the chattel mortgage be only a defensive-protective device to strengthen the stock pledge is further evidenced by the fact that the corporation had so recently executed the GMAC loan agreement, and it is assumed there was no intent to violate it.

The Chadderdons bargained with Smith for all the outstanding shares not owned by themselves and this they received when the transaction was executed. The cancellation of certain shares by the corporation did not alter this, and the sale by Smith was to the Chadderdons alone. The referee found that the Chadderdons in reality bought all the stock of Smith and this is well supported by the evidence.

Mrs. Chadderdon by her control of the corporation directed that corporate funds

be used to pay off the note she then held. The entire balance due on the note was so paid and no attempt was made to apportion the liability on the note between the co-makers, Mrs. Chadderdon and the company.

This court has said in Central States Corp. v. Luther, 215 F.2d 38:

> "In passing upon the allowance of claims, a bankruptcy court sits as a court of equity clothed with jurisdiction to sift the circumstances surrounding any claim to see that injustice and unfairness is not done in the administration of the bankrupt estate."

■ The transaction between the bankrupt corporation and its officers and directors from which the note and mortgage in the case at bar arose must be most carefully examined. A claim presented by an officer or director of the bankrupt is subjected to rigorous scrutiny and the claimant must prove good faith and fairness in the transaction. Goldie v. Cox, 130 F.2d 695 (8th Cir.). In Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 244, 84 L.Ed. 281, the Supreme Court said:

> "Hence, this Court has held that a bankruptcy court has full power to inquire into the validity of any claim asserted against the estate and to disallow it if it is ascertained to be without lawful existence. Lesser v. Gray, 236 U.S. 70 [35 S.Ct. 227, 59 L.Ed. 471]."

and

> "That equitable power also exists in passing on claims presented by an officer, director, or stockholder in the bankruptcy proceedings of his corporation. The mere fact that an officer, director, or stockholder has a claim against his bankrupt corporation or that he has reduced that claim to judgment does not mean that the bankruptcy court must accord it *pari passu* treatment with the claims of other creditors. Its disallowance or subordination may be necessitated by certain cardinal principles of equity

jurisprudence. A director is a fiduciary. Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 588 [23 L.Ed. 328]. So is a dominant or controlling stockholder or group of stockholders. Southern Pacific Co. v. Bogert, 250 U.S. 483, 492 [39 S.Ct. 533, 63 L.Ed. 1099]. Their powers are powers in trust. See Jackson v. Ludeling, 21 Wall. 616, 624 [22 L.Ed. 492]. Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. Geddes v. Anaconda Copper Mining Co., 254 U.S. 590, 599 [41 S.Ct. 209, 65 L.Ed. 425]. The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside. While normally that fiduciary obligation is enforceable directly by the corporation, or through a stockholder's derivative action, it is, in the event of bankruptcy of the corporation, enforceable by the trustee. For that standard of fiduciary obligation is designed for the protection of the entire community of interests in the corporation—creditors as well as stockholders."

The defenses to and validity of the note and mortgage as they pertain to the bankrupt corporation are such that they could be raised by a creditor or the corporation as of the time of bankruptcy; they are basic to the law of contracts.

■ The intention not to bind the corporation prevails over all other issues and is probably determinative whether or not there was consideration to the corporation for the execution of the note and mortgage. The findings clearly show that the signature of the corporation was to facilitate or accommodate the individ-

ual stockholders. Under Wyoming law an accommodation party can raise the defense of no consideration against the party accommodated. Wilde v. Amoretti, 47 Wyo. 193, 33 P.2d 399; Scott v. Wyoming Oils, 52 Wyo. 433, 75 P.2d 764. If such is the case, the corporation here could certainly under Wyoming law raise the defense of intention not to be bound.

"The trustee may have the benefit of all defenses available to the bankrupt as against third persons, including statutes of limitation, statutes of frauds, usury, and other personal defenses; and a waiver of any such defense by the bankrupt after bankruptcy shall not bind the trustee. * * *" (Section 70, sub. c, Bankruptcy Act; 11 U.S.C.A. § 110, sub. c).

The Supreme Court in Lewis v. Manufacturers Nat. Bank, 364 U.S. 603, 81 S.Ct. 347, 5 L.Ed.2d 323, considered the power of the trustee in bankruptcy to set aside secured transactions which were at any given point in time defective in that a creditor at such time could have prevailed over the secured creditor. The Court held that the right of a creditor had to be determined as of the date of bankruptcy, and the trustee could not go back in time and select a certain date to assert rights as a hypothetical creditor. As to the case at bar, the Supreme Court's construction of Section 70, sub. c of the Bankruptcy Act, 11 U.S.C.A. § 110, sub. c, places the trustee in the position of a creditor as of the time of bankruptcy, and if such creditor can then set aside the transaction so can the trustee. As to this point the Court in Lewis v. Manufacturers Nat. Bank, supra, stated:

"Congress in striking a balance between secured and unsecured creditors has provided for specific periods of repose beyond which transactions of the bankrupt prior to bankruptcy may no longer be upset —except and unless existing creditors can set them aside."

The position and rights of the trustee here were determined as of the time of bankruptcy in accordance with the Lewis case. The defense asserted, of intention not to bind the corporation, goes to the validity of the note itself and is a fundamental continuing one, not just an opportunity at some prior time. It was available at the time of bankruptcy.

Since the intention of the parties was that the note was not enforceable against the corporation and was not a corporate obligation, and since this intent is controlling on the claimant, there is for all practical purposes no note and no mortgage of the bankrupt upon which to base the claim in question. The order of the District Court confirming the decision of the referee, disallowing the claim, is affirmed.