# SCOTT v. WYOMING OILS, INC.

(No. 2019; February 1, 1938; 75 Pac. (2d) 764)

434

For the plaintiff in error, there was a brief and oral argument by *R. H. Nichols* and *S. J. Lewis* of Casper, Wyoming.

For the defendant in error, there was a brief and oral argument by *Edward E. Murane* of Casper, Wyoming.

RINER, Justice.

The district court of Natrona County rendered its judgment declining to subject the Wyoming Oils, Inc., a corporation organized and existing under the laws of this state, to a liability asserted to arise in consequence of two promissory notes signed by it and endorsed by J. T. Scott for the accommodation of that corporation and delivered to the Wyoming Trust Company, a banking institution engaged in business in the City of Casper, Wyoming. The action wherein this result was reached was brought by Scott, as plaintiff, against the Wyoming Oils, Inc., as defendant. That corporation will subsequently be referred to as the "Oil Company" or the "defendant," while Scott, who has brought the record here for review by proceedings in error, may be at times conveniently mentioned as the "plaintiff."

The material facts required to be considered are as follows: The Oil Company on March 20, 1933, executed and delivered to the Wyoming Trust Company of Casper, Wyoming, mentioned above, payable to the latter's order, its promissory note for $1500.00, due ninety

days after date, with interest at eight per centum per annum, duly endorsed by Scott as an accommodation endorser. It was indicated on said note that it was payable $250.00 in thirty days, $500.00 in sixty days and $750.00 in ninety days. On the principal of this obligation the Oil Company paid March 27, 1933, the sum of $250.00, and on May 9, 1933, the sum of $500.00, and these were the only payments ever made by it on said note. May 9, 1933, the Oil Company aforesaid also executed and delivered to the Wyoming Trust Company, already mentioned, drawn to the latter's order, another promissory note for $2500.00, which was payable $500.00 on July 10th and $500.00 on the 10th of each following month after date, with interest at eight per cent per annum, said note likewise being duly endorsed by Scott as an accommodation endorser. On account of this note the Oil Company never paid anything either as principal or interest.

In consequence of the failure of the maker of the note to meet these obligations, Scott was compelled to pay the balance due on the first note and the second one in full as follows: Under date of July 3, 1933, he paid the sum of $773.46; on August 10, 1933, the sum of $1000.00; on September 11, 1933, the sum of $500.00; on October 12, 1933, the sum of $500.00, and on November 16, 1933, the sum of $573.12. Upon Scott making these payments in liquidation of the obligations of the Oil Company, the Wyoming Trust Company endorsed the notes without recourse and delivered them to Scott. The Oil Company declined to reimburse him for these expenditures, and as already intimated, he brought suit in the district court aforesaid to recover the amount claimed to be due in consequence thereof.

The Oil Company was engaged in the oil refining business, and also after May 17, 1933, in operating a place where gasoline and oil were sold at retail. These two phases of its business activities may subsequently

be mentioned as the "refinery unit" and the "filling station unit" respectively. There were originally and until some time in August or September, 1933, only eight stockholders in the Oil Company, each holding one share of stock, with the par value of $100.00 per share, one of these stockholders being Scott. It seems, also, that early in the Company's business operations, Scott placed the sum of $2500.00 in the Oil Company's treasury, and the sum of $946.54 was contributed apparently by the other stockholders. No additional shares of stock, however, seem to have been issued to any one in consequence of these contributions, but the control and ownership of the company continued in the eight stockholders, as indicated above, until the latter part of August, 1933. Scott was serving as an officer and director of the corporation at the times the notes aforesaid were given, and continued as such until April 24, 1934.

The business operations of the Oil Company were not very successful, and on August 29, 1933, one H. C. Flaherty submitted to the officers and directors of the Oil Company a proposal whereby it was suggested that the refinery unit should be separated from the filling station unit. This result, in outline, was to be accomplished through the formation of a new corporation which should take over the refinery unit, leaving the filling station unit in the hands of the Oil Company. The capital stock of the latter was to be changed from the par value of $100 per share to $15 per share. The co-operative plan of that company was to be somewhat altered from the one theretofore in use by it, and Flaherty was to undertake at his own expense a campaign to obtain a minimum of two hundred new stockholders and to improve the filling station unit business. Flaherty was to be given five per cent of the gross receipts from all filling station business, and he was to have "equal authority" with the Oil Company's board

of directors to select that corporation's "chief filling station attendants and general manager and to determine all major managerial and policy phases directly connected with the operation of such filling station business." It was also proposed that "the corporation so receiving such refinery property and business to assume sole liability for payment of this company's present unpaid obligations properly chargeable to such business branch, a schedule thereof being hereto attached." The schedule mentioned was, however, not attached to the proposal. It was further proposed that the Oil Company should be required to purchase "all its filling station requirements for petroleum products" from the new corporation designed to be organized, at prices not above open market prices. The proposal additionally stated, "we will be able to promptly and satisfactorily liquidate all liabilities of this company which will remain its obligations following our participation in its corporate management, eliminating personal liability on the part of certain of your stockholders who have guaranteed payment of certain portions of this company's present unpaid corporate obligations." This scheme of reorganization of the Oil Company was presented in written form signed by Flaherty.

The proposal was immediately accepted by the Oil Company's board of directors and the proper officers of the corporation were authorized to cause a contract to be drafted which would carry out the objectives suggested. On the day following acceptance of the plan by it, to-wit, August 30, 1933, the Oil Company's board of directors reconvened, and, after deliberation, its president and secretary were authorized to execute and deliver the drafted contract in duplicate, one for Flaherty and the other to be affixed to the minutes of the meeting. These officers were authorized also to execute the necessary instruments to accomplish a transfer to the new corporation of the property com-

prising the refinery unit of the Oil Company, "subject to the certain unpaid obligations of this company, schedule of which is appended to the minutes of said meeting of this board held under date of August 29th, 1933, sole liability for payment of which is to be assumed by said refinery corporation." All necessary changes in the Oil Company's by-laws were then made to conform to the new plan of operation. A special meeting of the stockholders of the Oil Company was convened the same day, which unanimously confirmed these acts of the directors, and among other things "ordered that each stockholder signatory to the minutes of these proceedings, shall, by such signature, be deemed as having fully and finally released and discharged this company from any further obligation to issue to such stockholder, any stock of this company additional to that already owned by him on account of input of money or other values for corporate purposes or otherwise." The minutes of the meeting of the Oil Company's board of directors, accepting the Flaherty proposal, and also its stockholders' meeting aforesaid, were signed by all the eight stockholders of the Oil Company, including Scott.

The contract between the Oil Company and Flaherty was executed on August 30, 1933. It provided in accordance with the suggested plan aforesaid that the Oil Company's refinery unit property should be transferred to the new refinery corporation "in course of organization by and for the benefit of the present stockholders of first party, which shall assume sole liability for payment of that portion of first party's present unpaid liabilities properly chargeable to operation heretofore of its refinery unit, a schedule thereof being hereto attached as Exhibit 'A'." The schedule designated as "Exhibit A" was not attached to the contract. This agreement also embodied the other essential features of the Flaherty proposal above given,

and declared that "all corporate proceedings herein mentioned shall be deemed and made by reference, a part hereof."

The new corporation which was called into existence to take over the refinery unit appears to have been duly organized and to have undertaken the active operation of that unit. It was given the name of "Wyoil Refining Company," and will be subsequently herein referred to as the "Refining Company." The contract between the Oil Company and Flaherty provided also that the different stockholders of that company should "participate in issue of such refinery company's stock on the same relative basis as they would have been entitled to receive stock of" said Company "on account of their past input of money and other values, in its affairs."

George W. Jarvis, one of the original incorporators and stockholders of the Oil Company, was on August 30, 1933, secretary of that corporation, and as such, one of the officials who signed the written Flaherty contract described above. He stated as a witness for the plaintiff, on the trial of the action aforesaid, in response to the question whether a schedule was ever agreed upon between him and Mr. Flaherty to be attached to the minutes of the meeting of August 29, 1933,

"Not only agreed upon between Mr. Flaherty and myself, but our board of directors and myself."

He then stated that this schedule was reduced to writing, and he identified as the one agreed upon, a written list of obligations, plaintiff's Exhibit No. 6, which was received in evidence and which did not include the two notes mentioned above. He also testified that at the meeting of August 30, 1933, when the question of entering into a contract was discussed, Flaherty was present, and it was then discussed as to what obliga-

tions the proposed corporation, which should take over the refinery unit, should assume and pay; that Exhibit No. 6, aforesaid, correctly set out the list of these obligations; that both he and Flaherty were present at the meeting of the directors of the Oil Company on August 29, 1933, when Flaherty's proposition was presented to the latter and considered; that at that time the two notes aforesaid were discussed, and the officers of the Oil Company stated then that the Scott notes should remain a liability of that corporation. And on cross-examination, he also said that he, Jarvis, obtained this list of accounts aforesaid, from the bookkeeper prior to August 29, 1933.

The accountant, Charles S. Chapin, who kept the books for both the Oil Company and the Refining Company, from their inception, testified as a witness for the defendant, that the $4000.00 borrowed from the Wyoming Trust Company was part of the sum of money expended at the refinery part of the Oil Company's business for labor, crude oil, state and federal taxes, and other direct costs, and for refinery building and equipment; that the $750.00 used to repay part of the loan from the Wyoming Trust Company, as hereinbefore detailed, was not charged to the refinery end of the business; that the Oil Company received a loan of $2500.00 from the Wyoming Trust Company on May 9, 1933, and the filling station unit went into operation on the 17th of that month following. On cross-examination he stated that the Scott notes were the only obligations of the Oil Company outstanding on August 29, 1933, which had been guaranteed by any stockholder of that corporation within his knowledge; that under date of January 11, 1934, Chapin wrote and mailed a letter, received in evidence without objection, addressed to the Oil Company, copy thereof being sent to the Refining Company, the first paragraph of which read:

"At the request of the officers of your company, and of the officers of the Wyoil Refinery Co., we are this date setting up as a liability on the books of the Wyoming Oils, Inc., the following accounts which were owing as at September 1, 1933. These accounts, in accordance with mutual agreement between the two companies and H. C. Flaherty, were determined to be the liabilities remaining with the Wyoming Oils, Inc., at the date the Wyoil Refinery started operations.";

that the first of these items of account thus listed was "Notes Payable $3,250.00," this amount indicating the Scott notes; that the latter was returned to him with a memorandum containing an approval of this statement, signed by officers of the two companies, and reading:

"Accept this as your authority for making the entries on our respective books as explained in the above letter.

Yours very truly,
WYOMING OILS, INCORPORATED
By J. T. Scott
WYOIL REFINING CO.
By Geo. W. Jarvis";

that Chapin obtained these items of account from the books of the Oil Company; that the $3,250.00 indebtedness represented by these two notes was carried in all statements of accounts of the Oil Company from August 29, 1933, until December 31, 1934, that these notes were not paid in December, 1934, by the Oil Company; that Mr. Flaherty, as the then president of the Oil Company, by written direction, under date of February 20, 1935, ordered him, as the company's bookkeeper, to write these notes off as an obligation of the Oil Company as of December, 1934; that the December, 1934, statement was not made up until after the written instructions from Flaherty were received; that Chapin told McCamly—who was during January and February, 1935, negotiating with Flaherty for the purchase of the latter's contract aforesaid with the Oil Company

—what Flaherty had ordered done, as related above, relative to the Scott notes. This witness, on redirect examination, referring to the statement contained in his letter of January 11, 1934, also said that Flaherty never authorized him to make an entry on the books of the Oil Company in accordance therewith.

On April 10, 1934, at a meeting of the board of directors of the Refining Company, of which plaintiff was a member and when he was present, the president of that corporation stated that the meeting was called "to attempt to make some reparation to J. T. Scott for moneys borrowed by the Wyoming Oils, Inc., from the Wyoming Trust Company, which sums had been repaid to said Wyoming Trust Company by Mr. Scott, as indorser, upon failure of the Wyoming Oils, Inc., to liquidate same when due." A mortgage deed upon the property of the Refining Company, located at Mills, Wyoming, was thereupon authorized by the directors of that company, and the minutes of the meeting then stated: "Without motion being made it was agreed that Mr. Scott should make every effort to first secure repayment from the Wyoming Oils, Inc." This instrument mortgaging the corporation's property was dated April 10, 1934, was acknowledged on June 14, 1934, and duly recorded July 14, 1934, in the office of the county clerk of Natrona County, Wyoming, but seems never to have been in the possession of Scott, who had never seen it until a day or two before the trial of the action.

Scott was president of the Oil Company from October 7, 1933, until April 24, 1934, and during that time the matter of these two notes was frequently discussed at directors' meetings of that company, and he was hopeful, but the first formal written demand for repayment was made by Scott on April 29, 1935.

McCamly seems to have purchased the Flaherty contract, through assignment from the latter, sometime in

January or February, 1935, so far as can be gathered from the uncertain state of the record concerning the matter. He then took over the exclusive management of the Oil Company.

The plaintiff's action was commenced on June 1, 1935, by filing his petition in the usual form, on these two notes, to recover the sum of $3,346.48 claimed to be due thereon. The defendant's answer contained as a first defense, for the most part, a general denial. There was set forth secondly, as a further defense, an averment of the full payment of said notes by the defendant. Another affirmative defense appeared in this pleading alleging in substance that the Refining Company took over all the refinery business of the defendant and that this new corporation agreed to assume all of the indebtedness theretofore incurred by said defendant which was properly chargeable to said refinery branch; that all of the funds raised by means of the obligation sued upon were used for the refinery unit; that plaintiff individually and as an officer and director of the defendant approved the transfer of these properties from the defendant to the Refining Company, and also approved a contract with Flaherty, dated August 30, 1935, whereby it was agreed that the notes were to be assumed by the Refining Company; that in compliance with said contract the Refining Company assumed said notes, which theretofore were an obligation of the Oil Company, and agreed to pay them and hold the Oil Company harmless relative to them; that the Refining Company carried out said contract to the extent of giving plaintiff a mortgage on its assets as security for the payment of the two notes aforesaid, and he accepted said mortgage and still holds the same; that plaintiff as an incorporator, officer and director of both the Oil Company and the Refining Company actively participated in all transactions between the defendant, H. C. Flaherty, and the Refining Company;

that Flaherty sold his interest in said contract to one W. L. McCamly, who as an innocent purchaser bought without notice of the plaintiff's claim; that said contract was in substance a sale of all the beneficial interests and assets of the Oil Company; that it would be inequitable as to all the present stockholders of the defendant to permit the plaintiff to make claim against the defendant for the obligations sued upon after plaintiff's conduct approving the transactions aforesaid, by which he is now estopped from making such claim.

Plaintiff's reply to this answer was a denial of the new matter therein alleged.

The case was tried to the court without a jury, with the result already indicated, the case being decided apparently on the theory that a shifting of obligations was accomplished by the transactions hereinbefore detailed so as to constitute a novation between the plaintiff, the defendant and the Refining Company relative to plaintiff's claim. The court, upon request of counsel, made special findings of fact and conclusions of law and based the judgment complained of thereon. The theory upon which the case was disposed of in the district court appears also to accord with the position taken by the Oil Company upon the record presented here.

The plaintiff complains of a number of the conclusions of fact and law announced by the trial court, as inaccurate and unsupported by the evidence, but inasmuch as all the evidence introduced on the trial of the case has been brought up for our examination, we must scrutinize the entire record before us to determine whether the judgment challenged by the assignments of error presently to be mentioned is improper. Hilliard v. Douglas Oil Fields, 20 Wyo. 201, 214, 122 Pac. 626; Sewell v. McGovern, 29 Wyo. 62, 73, 74, 211 Pac. 96; Delfelder v. Poston, et al., 42 Wyo. 176, 195-196, 293 Pac. 354.

Plaintiff assigns as error that the judgment was contrary to law and unsupported by the evidence and that neither the defendant's answer nor the evidence in the case upholds the theory of novation. In view of these contentions we have hereinabove elaborated rather fully the especially significant and material evidence and testimony given in the case, and shall also presently mention additional portions thereof as may be necessary.

It is said for the defendant that Scott was the largest investor in that corporation at the time the plan of the reorganization of its business was worked out and the contract with Flaherty executed, and that the plaintiff controlled not only the Oil Company, but also the Refining Company, to the extent that he was practically dictator of management and policies in both. While it is true that he had put more money into the treasury of the Oil Company than the other stockholders, undoubtedly in an effort to make its business successful, yet he seems not to have exacted anything in return for so doing. He never held more than one share of stock in the defendant corporation. The seven remaining stockholders had full power, so far as we can perceive, to out-vote him if they so desired and thereby to absolutely control the corporation's action against him. The same thing seems to have been true as regards the Refining Company. If it were true that plaintiff actually dominated these corporations, as suggested, doubtless he could and would have forthwith compelled new obligations to have been issued to him by both corporations, when he was obliged to pay out his own funds for the defendant's benefit. It is unlikely, as claimed, he would have wholly released one, and relied solely on the other, especially in view of Flaherty's assurances that the former would be a business success in consequence of the proposed changes in management.

Much stress is laid by the defendant upon the fact that the plan submitted by Flaherty to it and the contract executed by it and that party provided that the Refining Company should "assume sole liability for the payment" of the defendant's "present unpaid obligations properly chargeable to such business branch," and the fact that Chapin testified that the $4000 borrowed from the Wyoming Trust Company on the notes in controversy was expended at the refinery unit. But all the defendant's corporate transactions occurring on August 29th and 30th, as above described, must be looked to, to determine the real meaning of the language aforesaid, as the contract expressly states, as we have seen, that "all corporate proceedings herein mentioned—(and the corporate transactions above described are expressly in that contract mentioned)—shall be deemed and made by reference a part hereof."

Upon examination we find that Flaherty in his proposed plan assured the defendant's then stockholders that he would be able to "promptly and satisfactorily liquidate all liabilities" of the defendant which "would remain its obligations following" his "participation in its corporate management, eliminating personal liability on the part of certain of" the defendant's stockholders "who have guaranteed payment of certain portions of" the defendant's "present unpaid corporate obligations." As will be recalled, the testimony of the witness Chapin, the defendant's accountant and bookkeeper, on cross-examination, was that the only obligations of the defendant corporation on August 29, 1933, which had been guaranteed by any of the defendant's stockholders were the Scott notes so far as he knew. Indeed, none others are mentioned in the record by any other witness.

Additionally, there is the schedule of debts which should have been attached to the minutes of both the directors' meeting of August 29, 1933, and the contract

with Flaherty, but was not. As hereinbefore recited, the witness Jarvis stated that the written schedule of debts indicated in the record as plaintiff's Exhibit No. 6, was the list of obligations agreed upon between Flaherty and him and the defendant's board of directors which should have been, but was not, attached to the minutes of the board of August 29, 1933. According to his testimony, Flaherty was present at this meeting, and the Scott notes were discussed, and the officers of the defendant corporation indicated that these notes should remain the obligations of the defendant. It is significant that none of the other directors or officers of the defendant who were present, among whom were Charles Anda, Fred Moore, S. J. Lewis, H. B. Durham and R. H. Nichols, were called as witnesses to contradict Jarvis if he were mistaken in his testimony.

But it is said that the testimony of Flaherty is in conflict with that of Jarvis on this matter, the consequence being under the familiar rule of appellate practice that the judgment should not be disturbed. We hardly think that this contention is correct. Flaherty testified by deposition only that when he was negotiating during January and the early part of February, 1935, with McCamly for the sale of his (Flaherty's) contract aforesaid to the latter, he told McCamly that "the notes executed by Wyoming Oils, Inc. to the Wyoming Trust Company and endorsed by J. T. Scott had been assumed by Wyoil Refining Company and that they were not a claim against Wyoming Oils, Inc." He also testified, over the objection of the plaintiff, although so far as the record discloses he had nothing to do with the defendant corporation until August, 1933, that the money borrowed from the Wyoming Trust Company was used for the refinery unit and none for the filling station unit; that the schedule of debts referred to in the contract between him and the defendant as Exhibit A was not attached thereto; and that

"it is" his "understanding that inasmuch as the money raised on these two promissory notes was used for the refinery unit, said notes were not to be charged against the filling station unit which was the Wyoming Oils, Inc. but that said claims would be assumed by the new corporation, Wyoil Refining Company."

The testimony of Jarvis that the matter of the Scott notes was discussed at the directors' meeting of the Oil Company held on August 29, 1933, is corroborated by the mute evidence of the written proposal itself made by Flaherty, for as noted above he therein assures the officers and directors of the Oil Company, in so many words, that by his efforts the personal guaranty liability of defendant's stockholders, for its debts would be "eliminated." It will be observed that Flaherty did not testify that he did not agree with the defendant's officers and board of directors as to the written list of debts aforesaid; that the matter was not discussed or that the officers of the defendant had not then said that the Scott notes should remain the obligations of the defendant corporation. Indeed, he was not asked concerning these matters. What Flaherty told McCamly certainly could not alter the legal status of the matter existing through agreement with the officers of the defendant, nor could his understanding of the arrangement when he was endeavoring to sell his contract to McCamly affect the situation.

It is undisputed through Mr. Chapin's testimony also that the Scott notes were carried on the books of the defendant company as its obligations all the time from August, 1933, until February, 1935, when they were merely undertaken to be written off—not paid by the defendant—at the direction of Flaherty, as the defendant's then president, at a time when he was negotiating with McCamly, as already stated. Undoubtedly Flaherty knew, or should have known, what the books of the company showed during all this period, as he was

managing the company. He seems not to have objected to such showing until the matter of the sale of his contract to a third party was under consideration.

When there is taken into consideration with the foregoing that the officers of both the Refining Company and the Oil Company approved by written memorandum in January, 1934, the Chapin statement showing the Scott notes as liabilities of the defendant, and that on April 10, 1934, the directors of the Refining Company gave a mortgage to the plaintiff as an attempt at "reparation," but stated that it was agreed that he should make every effort to first secure repayment from the Wyoming Oils, Inc., it would hardly seem that such statements indicate that the Refining Company regarded itself as primarily liable. Indeed, the views thereby expressed are strongly corroborated by the fact that without protest on the part of anyone the Oil Company had been for many months carrying these liabilities on its own books. We cannot overlook such undisputed evidence but are obliged to conclude that the judgment in question is contrary to the evidence in the case.

But if we are mistaken in this, we think the judgment may not stand for another reason. There was no novation as contended by the defendant.

20 R. C. L. 360 states that a novation as understood in modern law "is a mutual agreement, between all parties concerned, for the discharge of a valid existing obligation by the substitution of a new valid obligation on the part of the debtor or another, or a like agreement for the discharge of a debtor to his creditor by the substitution of a new creditor." 46 C. J. 578-579 says: "In every novation there are four essential requisites: (1) A previous valid obligation. (2) The agreement of all the parties to the new contract. (3) The extinguishment of the old contract. (4) The validity of the new one. This enumeration is frequently

stated in the cases. If these essentials, or any one of them, is wanting, there can be no novation." Restatement of the Law of Contracts, Ch. 13, § 424, P. 798, covers the same subject-matter by announcing that a novation is a contract "that (a) discharges immediately a previous contractual duty or a duty to make compensation, and (b) creates a new contractual duty, and (c) includes as a party one who neither owed the previous duty nor was entitled to its performance." The text last cited in commenting on this statement of the law says: "It is a requisite of a novation that it operates as an immediate discharge of a previous duty. A contract to discharge in the future such a duty is not a novation." In 3 Williston on Contracts, § 1865, P. 3194, the learned author points out that: "Novation necessarily involves the discharge of an old debt or part of it and the creation of a new one. There is no novation until this has been accomplished.. In a broad sense it may be said that the discharge of the old debt is the consideration for the creation of the new one." Abundant authority in the case law of the several states of the Union may readily be supplied to support these propositions set forth by the excerpts above given. We shall not lengthen this opinion by undertaking to do so here.

Supplementing these statements of the law is another principle which our examination of the authorities leads us to think is reasonably well settled, viz: There is no release of the original debtor nor an extinguishment of the original debt merely because the creditor, with knowledge of the assumption by a third person of the debtor's obligation, consents thereto. North Western Mutual Life Insurance Co. v. Eddleman, 247 Ky. 116, 56 S. W. (2d) 561; 87 A. L. R. 276; 87 A. L. R. 281 and cases cited in note.

The general rule also would appear to be that a novation is never presumed but must be pleaded and proven

as affirmative matter, the burden of proof resting on him who alleges it. Such a pleading should set forth all the essential elements of a novation clearly and definitely or by necessary inference from the facts averred. Robertson v. Vandalia Trust Co., 228 Mo. App. 1172, 66 S. W. (2d) 193; Wheatland Tube Co. v. McDowell & Co., 317 Pa. 295, 176 Atl. 217; Benton v. Morningside College, 202 Iowa 15, 209 N. W. 516; Redewill v. Matzenauer, 32 Ariz. 13, 255 Pac. 486; Kirkup v. Anaconda Amusement Co., 59 Mont. 469, 197 Pac. 1005; Morrison v. Kendall, 6 Ind. App. 212, 33 N. E. 370; Money v. Dameron, (Tex. Civ. App.) 70 S. W. (2d) 291; Fredeking et al. v. Read et al., 113 W. Va. 722, 169 S. E. 387; Negbaur et al v. Fogel Const. Co., (Mo. App.), 58 S. W. (2d) 346; Grant-Holub Co. v. Goodman, 23 Ohio App. 540, 156 N. E. 151; Tudor Press, Inc. v. University Distributing Co., (Mass.) 198 N. E. 244; LeBar et al. v. Patterson, 123 Pa. Sup. Ct. 491, 187 Atl. 278; 46 C. J. 624, and cases cited.

Laying aside the point urged for the plaintiff that there was no sufficient allegation in defendant's answer of all the essential elements of a novation, although under the authorities cited above there is, as we view the pleading, grave doubt of sufficiency in the statement of the defense thus attacked, we are inclined to think that the evidence in the case, as we have reviewed it above, quite fails to show that Scott agreed that the debt owed by the defendant on the notes aforesaid should be wholly extinguished, the defendant released, and that he should look only to the Refining Company for payment. We think the evidence establishes the contrary.

Additionally it may not be overlooked that at the time the proposal of Flaherty was made to the defendant, accepted by it and the contract between the parties executed, Scott was not the owner or holder of both the notes in suit. One, at least was held and owned by

the Wyoming Trust Company at that time. It is true that the plaintiff had then paid $773.46 to the Trust Company on July 3, 1933, for the purpose of liquidating the balance due on the $1500.00 note. We may, perhaps, assume that this note was thereupon immediately endorsed to him, though the record does not specifically show this, and the defendant denies it in its answer. Mr. Scott testified only that he received the notes from the Wyoming Trust Company after he had paid that corporation the amounts due on the two notes. But on the $2500.00 note, Scott had paid only $1000.00 on August 10, 1933, the final payment on that obligation not being made until November 16, 1933.

Just here we may also very well bear in mind the legal principle that in a claim of novation, such as we are now considering, it is requisite that the discharge of the original obligation must be contemporaneous with and result from the confirmation of the agreement with the new debtor. Hicksville Handle Co. v. Herb., (Mo. App.) 226 S. W. 63; Leckie v. Bennett et al., 160 Mo. App. 145, 141 S. W. 706; Restatement of Law of Contracts, supra; 46 C. J. 616-617.

In Emerson-Brantingham Implement Co. v. Sawyer, 210 Mo. App. 535, 242 S. W. 1007, it appeared in an action on promissory notes given by a father and son, secured by chattel mortgage on certain property, that the payee of the note and the son and his brother agreed that the two last named parties should execute new notes and a new mortgage on the same property and this was done. The father thereafter being informed of the transaction stated it was all right. Holding that there had been no novation, the court said:

"Had J. F. Sawyer been present when the new notes and mortgage were executed, and consented to the transaction at that time, he would have been bound; but, since he was not present, and did not agree to the arrangement at the time by which, if permitted to

stand, he would lose all interest he then had in the property, he was not bound, and a mere verbal assent afterward did not make him a party to the transaction, nor bind him, and, if he was not bound, then none were bound, and there was no novation. To constitute a valid novation the interested parties must all agree to it at the time it occurs. Novation must rest upon contract and be clearly shown. It cannot be made binding by subsequent acquiescence or ratification without a new consideration or the existence of facts which will constitute an estoppel. The discharge of the original debtor must be contemporaneous with and result from the consummation of an arrangement with the new debtor. Lackie v. Bennett et al., 160 Mo. App. 145, loc. cit. 160, 141 S. W. 706; L. & A. Scharff Distilling Co. v. Springfield Coal, Ice & Transfer Co., 180 Mo. App. 497, 501, 166 S. W. 654; 20 Cyc. 1134."

And in Davlin v. Kowalk, 54 Oh. App. 222, 6 N. E. (2d) 798, it was held that evidence that the daughter of the payee of a promissory note had assumed the note for a valuable consideration, with payee's assent, the daughter being the maker's wife, did not establish a novation, but merely raised a presumption that the payee accepted the agreement as collateral security. After enumerating the essentials of a novation, the court said:

"It will be noted that under this rule, one of the essential elements of a novation is the extinction of the old obligation.

"Where the note evidencing the old obligation is retained by the creditor, there is a presumption that the new obligation is taken as collateral security to the old obligation and not in substitution for or extinction of the old obligation. Crumbaugh v. Kugler, 3 Ohio St. 544, 548.

"There is no allegation in the answer that the plaintiff at any time consented or agreed to the extinction of the old obligation or to the substitution of Ruth Kowalk as his debtor in place of the defendant makers of the note. The allegations of the answer only go to the extent of averring that Ruth Kowalk, for a valua-

ble consideration, assumed the note and that the plaintiff payee assented and consented to her assumption of the note. There is no averment that the note was surrendered and the only inference that can arise from the averments of the answer is that the note was not surrendered. Giving effect to the presumption mentioned, the inference arising from the allegation of the answer is that the payee of the note accepted the oral agreement of Ruth Kowalk as collateral security for the payment of the note held by him and not in extinguishment of, or, as a substitution for, the note. The facts alleged, therefore, did not constitute a defense."

In the case at bar, of course, when the agreement was made with Flaherty, Scott never surrendered the notes of defendant or took any new notes from the Refining Company. Surveying the record before us, we are unable to perceive how it may be deducted that Scott, Flaherty and the other officers and directors of the defendant company could have intended or accomplished a novation on August 29th or 30th, 1933, when they all knew, or should have known that Scott was at the time not the legal owner and holder of at least one of the notes; that he was not primarily liable thereon; that he had paid only a part due the holder thereof, and that under the proposition submitted by Flaherty and accepted by the corporation, the obligations of the defendant on which he was personally liable, were proposed to be liquidated and his liability "eliminated." There is no claim advanced that the novation extended to only part of the obligation involved even if such an arrangement were possible. And it is not suggested that the Wyoming Trust Company was a party to any agreement entered into between the parties on the dates last above mentioned.

It may be pertinent to recall here that the New York Court of Appeals in Van Duzer v. Howe, 21 N. Y. 531, pointed out, through Judge Denio, that: "One who indorses for the accommodation of a prior party does

not thereby become the holder of the bill, nor can he maintain an action upon it until he has taken it up by paying the amount to a subsequent purchaser." See also Sections 74-206, 74-803, W. R. S. 1931, well known sections of the Negotiable Instrument Law dealing with the rights of accommodation parties.

The disposition of this case we are consequently compelled to announce is that the judgment rendered by the district court of Natrona County should be reversed with instructions to enter its judgment in favor of the plaintiff for the amount claimed in his petition.

*Reversed.*

BLUME, Ch. J., and KIMBALL, J., concur.