E. V. DESMOND,

*Plaintiff and Respondent,*

vs.

GEORGE M. POULOS,

*Defendant and Appellant.*

E. V. DESMOND,

*Plaintiff and Appellant,*

vs.

GEORGE M. POULOS,

*Defendant and Respondent.*

(Nos. 2494, 2495; November 27, 1951; 237 Pac. (2d) 853)

130

For the defendant and appellant in case No. 2494 and defendant and respondent in case No. 2495 the causes were submitted upon the briefs and also oral argument of William H. Brown, Jr., of Casper, Wyoming.

For the plaintiff and respondent in case No. 2494 and plaintiff and appellant in case No. 2495 the causes were submitted upon the brief and also oral argument of A. Joseph Williams of Cheyenne, Wyoming.

## OPINION

RINER, Justice.

These two cases by direct appeal are grounded upon the same record, E. V. Desmond being plaintiff and respondent and George M. Poulos being defendant and appellant in No. 2494. In No. 2495 Desmond appears as the appellant and Poulos as the respondent. This situation of the parties has ensued in consequence of the judgment of the District Court of Laramie County on the subject matter involved, that judgment being in part adverse to Desmond and in part adverse to Poulos. Each of these parties being dissatisfied with the several rulings against them have seen fit to bring the record here for review. A brief outline of the pleadings filed below will make it reasonably clear what issues were involved.

Plaintiff Desmond's amended petition following the requirements of section 3-1408 W.C.S. 1945, providing for abbreviated pleadings on instruments for the payment of money, after alleging in the first paragraph thereof that throughout the year 1948 and at all times mentioned in the pleading plaintiff was a duly licensed real estate broker under Wyoming law, having his place of business at Cheyenne, Wyoming in paragraph 2 thereof avers:

"That on or about the 18th day of July, 1948, the defendant, George M. Poulos, drew and delivered to the plaintiff, E. V. Desmond, a promissory note in writing, of which the following is a copy, with all credits and endorsements thereon:

"For services rendered I agree to pay E. V. Desmond licensed Real Estate Broker a commission of $9,000.

/s/ *George M. Poulos*

"that there is due to plaintiff on such instrument from the defendant the sum of $9,000, which the plaintiff

claims, with interest on said amount at seven per cent. (7%) per annum from the 18th day of July 1948."

Judgment was prayed against the defendant for the sum of $9,000 with 7% interest from the 18th day of July in 1948 and costs.

The defendant, Poulos' amended answer and cross-petition states that he admits the allegations in paragraph No. 1 of said pleading and denies the allegations in its paragraph No. 2. In paragraph No. 3 it is alleged in substance that about July 17, 1948, this defendant and his associates (who are not named) residing in Casper, Wyoming, met with plaintiff in Casper to negotiate the purchase of the Henning Hotel in that city. That plaintiff represented "to this defendant and his associates that he had obtained authority from the owner of said business of property to negotiate a sale thereof for the sum of $450,000 (four hundred and fifty thousand dollars), and that he, the plaintiff, could also negotiate a loan of not less than one quarter of a million dollars ($250,000) with an interest rate not to exceed 4% per annum and for a minimum term of ten years repayable in equal monthly or less frequent installments, so that if this defendant and his associates desired to purchase the same for $450,000 it would require minimum capital of only $200,000."

That defendant and his associates agreed with plaintiff that "they would like to purchase said property for that price providing that the plaintiff was certain he could negotiate a loan to them on the security only of said hotel property in the sum aforesaid and providing that such loan be made by one of the major life insurance companies engaged in the business of making loans with an interest rate not exceeding 4% per annum." That plaintiff assured defendant and his associates he could obtain such a loan immediately and offered to do so for a total commission of $9,000, this amount to be

payable after the loan had been made and the sale completed as thus agreed. That pursuant to such agreement plaintiff prepared on a printed form a contract of sale which was executed by W. F. Henning, owner of said business and property, and by and in the name of this defendant as purchaser a true and correct photostatic copy of such contract being attached to defendant's pleading as Exhibit A, and made a part thereof.

In paragraph 4 it is alleged that thereafter plaintiff tried to obtain such a loan in Denver in the amount aforesaid through Insurance Company representatives and other sources, but failed to find or obtain anyone or any corporation willing and able to make such a loan, in consequence defendant and his associates were unable to purchase said property and the plaintiff failed to perform the services upon which defendant had agreed to pay the $9,000 commission upon the conditions stated above. That for this reason there was a failure of consideration to support said promise.

Paragraph 5 of defendant's pleading states that at the time plaintiff obtained the signature of defendant to the statement in plaintiff's amended petition, said plaintiff represented that defendant's signature thereto was intended only to evidence the amount of the commission to which plaintiff would be entitled if the loan had been consummated and the purchase of said property completed and said statement, promise or agreement—whatever it may be, "is wholly void and of no force and effect."

Attached to and following defendant's amended answer is what is designated as an amended cross-petition which in its first paragraph in large measure repeats the allegations of defendant's amended answer. In the second paragraph of defendant's amended cross-petition it is stated:

"That upon the representation of the plaintiff that he, the plaintiff, could negotiate such a loan to the defendant and his associates, and that he would negotiate such a loan if the defendant would make out and deliver to the plaintiff his check for Five Thousand ($5,000.00) Dollars payable to W. F. Henning, and execute the contract of purchase, marked exhibit 'A' attached to the Answer and Cross-Petition filed herein and made a part hereof by reference, for acceptance by the said W. F. Henning, and the defendant relying upon said representations by the plaintiff executed and delivered said check and contract to the plaintiff for acceptance and execution and delivery to the said W. F. Henning."

Paragraph 3 of said amended cross-petition avers that said contract was executed by Henning and said check delivered to him. Paragraph 4 of the amended cross-petition also alleges that the time fixed for payment of the balance of $445,000 was September 1st 1948 and plaintiff represented to defendant that if the purchase of said hotel property was not completed by that time that plaintiff had arranged with Henning for the return of said $5,000 down-payment so that the defendant and his associates would incur no loss or expense other than the expense of their trip to Casper.

Paragraph 5 of said amended cross-petition states further that plaintiff obtained no loan in the necessary amount during the time prescribed by the contract of sale; that Henning died prior to September 1st 1948; and that "as a result thereof" the defendant was able to defer the forfeiture of said $5,000 down-payment to Henning's estate by initiating a proceeding against the executor of his estate which was done upon the prospect that plaintiff might still obtain after September 1st 1948 the necessary loan for defendant and his associates; that plaintiff failed to obtain such loan:

"by reason of which this defendant was subjected to the threat of a suit for damages for breach of said contract of purchase, but escaped such threat and liability

by releasing said contract of sale *which had already terminated* and in turn obtaining a release from the estate and heirs of said deceased seller from any further liability under the terms of said contract." (Italics supplied).

Paragraph 6 alleges that by reason of the breach of contract by plaintiff and plaintiff's failure to perform the covenants which he represented he would perform in obtaining a loan as aforesaid this defendant has been damaged in the sum of $5,000 plus interest from September 1st, 1948. It was prayed that defendant recover judgment against plaintiff on the latter's amended petition and on the cross-petition of defendant, judgment was asked against the plaintiff in the sum of $5,000 with interest as stated above.

Plaintiff filed a reply which generally denied the allegations of defendant's amended answer except plaintiff admitted that he procured the signature of the contract of sale aforesaid as a licensed real estate broker.

Answering defendant's amended cross-petition plaintiff admitted that he met with defendant and his Casper associates on July 17, 1948 for the purpose of negotiating the purchase of the Henning Hotel in Casper, Wyoming. All of the other allegations of that pleading's first paragraph were denied.

He admitted that defendant executed and delivered said check and contract to plaintiff but denied all other allegations of paragraph 2 of said cross-petition. He admitted the allegations of paragraph 3 of the cross-petition but denied all allegations of paragraphs 4, 5 and 6 of said cross-petition and denied generally the allegations in said cross-petition. He renewed the prayer of his amended petition and requested judgment in his favor on the cross-petition of defendant.

The cause was tried to the court without a jury and

omitting recitals concerning the appearance of counsel the judgment rendered by the district court, May 4, 1950, was as follows:

"* * * evidence having been taken and the Court being advised finds as follows:

"(a) That Plaintiff is entitled to recover from defendant on his petition according to the prayer thereof.

"(b) That plaintiff represented to defendant that the five thousand dollar down-payment on the hotel property would be refunded should the purchase not be consummated; that said purchase was not consummated; and that defendant is entitled to recover from plaintiff on defendant's cross-petition.

"IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that the plaintiff have and recover judgment from defendant in the sum of four thousand dollars ($4,000.00), plus interest at seven per cent per annum, from September 1, 1948 to date of this judgment, together with costs of this action in the sum of _____dollars.

"Both plaintiff and defendant except to the above findings, and judgment, and each is hereby granted an exception."

## No. 2494

It is evident from the foregoing that the court gave this judgment in favor of plaintiff, Desmond, for the amount of the commission claimed to be due for his services in obtaining Henning's signature to the contract of sale, Exhibit "A" as testified by the plaintiff. The latter said on this point on direct examination:

"Q. Now, this note uses the words, 'For services rendered—'. What were the services which you rendered, Mr. Desmond?
"A. To obtain Mr. Henning's signature to this contract of purchase.
"Q. To purchase what?
"A. The Henning Hotel."

On cross-examination Desmond also said:

"Q. Didn't you previously testify in this case, Mr. Desmond that your services consisted only of obtaining Mr. Henning's signature to the purchase contract?

"A. That is true.

"Q. You have also testified to that today, haven't you?

"A. That's right."

In explanation of these questions and answers on cross-examination it may be noted here that this cause was first tried before the Hon. V. J. Tidball who died before judgment had been announced by him in the pending matter.

It seems to be urged on behalf of the defendant that there was no proof submitted by plaintiff "what the consideration was to support his demand for $9,000." But the quotations from the record as set forth above demonstrates the fact to be otherwise. Even the defendant himself appears to concede that the true consideration for the instrument Poulos signed was for "services rendered." At the time Poulos fixed his signature to the instrument sued on by the plaintiff the only services the latter had rendered defendant were those mentioned in the excerpt from Desmond's testimony given above. In signing that instrument Poulos conceded that he and he only was responsible for Desmond's commission of $9,000. He said nothing at that time about other persons being liable for the commission. Not only is that true, but it is also true that the contract of sale was signed *only* by Poulos. Nowhere therein is anyone other than the defendant mentioned in that contract referred to in the record as "Exhibit 1," as the purchaser of the Henning Hotel. It is true that underneath defendant's signature to the most part of the contract of sale he put the letters "Pres" but he evidently signed twice afterwards without affixing any-

thing following his signature. Mr. Desmond also testified on cross-examination in answer to the question of counsel:

"Q. Did you then consider that he was signing in his individual capacity or as president of something—president of anything?

"A. I didn't know what he was president of. That didn't mean anything to me, Mr. Brown. There was no mention of a company, corporation or I mean a corporation or individual corporate body. Mr. Poulos and I were dealing together. There was no mention of any company, corporation or anything else when that contract was signed."

Desmond also stated that the only signature he was interested in was that of George Poulos and that he, Desmond, was working for Poulos. Desmond also stated as a witness that at the Saddle Rock Cafe in Casper, the defendant stated that he would pay me (Desmond) $9,000 as Desmond's fee in the matter. Thereupon Desmond said: "I told him (Poulos) that was less than the schedule allowed by the State of Wyoming and he stated: 'Ed, I think you should accept the $9,000 because you didn't know the Henning Hotel was for sale until I told you to go up and try and get it for *me.*' Q. And then what did you say, if anything? A. I said, 'If that is the commission you want to pay, then it is all right with me.' " After Desmond had obtained Henning's signature to the contract of sale (in triplicate) and had taken these signed instruments back to the Saddle Rock Cafe where Poulos was, Desmond was congratulated by the owner of the cafe, one Velous and others who were there and who stated to him that "Desmond was to be congratulated * * * that any man that could deal with Mr. Henning should be congratulated as Mr. Henning was one of the hardest men in Casper to do business with. Q. Now where was Mr. Poulos at that time? A. Mr. Poulos was there." It is

plain that there was substantial evidence submitted to support the finding of the court on plaintiff's amended petition.

In this connection it is urged on behalf of the defendant that the Principles of the Law of Novation are applicable to the facts appearing in this record. We are unable to perceive that this is so. Those principles were reviewed to some extent in our decision in Scott vs. Wyoming Oils Inc., 52 Wyo. 433, 75 P. (2d) 764. Quoting 46 C. J. 578-9 it is there pointed out that:

"In every novation there are four essential requisites: (1) A previous valid obligation. (2) The agreement of all the parties to the new contract. (3) The extinguishment of the old contract. (4) The validity of the new one. This enumeration is frequently stated in the cases. If these essentials, or any one of them, is wanting, there can be no novation."

The text mentioned in the aforesaid case supplies an elaborate list of decisions which support the announcement in that text made. 66 C.J.S. reiterates the same statement with supplemental authorities. Counsel for Poulos states in his brief:

"The original debtor (if any) is a group for which George M. Poulos signed as President and the original creditor (if any) is E. V. Desmond. It is the apparent intention of the creditor, Desmond, to substitute as debtor. George M. Poulos individually and in his own behalf, in place of the original group with whom he contracted with regard to compensation for his services."

The difficulty inherent in defendant's position on this point as set forth above is that the record makes it clear that not only Desmond but Poulos himself considered that from the very inception of negotiations Poulos was the one who induced Desmond to act in connection with this matter of securing Henning's consent to the sale of the Henning Hotel. It nowhere appears

that Desmond regarded his employment as being initiated or continued by the "group", mentioned in the quotation last above recited. Even those who composed that "group" is not undertaken to be specifically explained in the record. Enough is quoted from the testimony given herein to indicate that there was ample proof to support the trial court's view that Poulos was the only debtor of Desmond throughout the entire transaction. He and no one else signed the instrument sued on by Desmond. While it is true that Poulos placed after one of his signatures on the contract of sale of the hotel the letters "Pres" yet there also appears below the latter's written signature the word "BUYER" and below certain additional typed provisions on the reverse side of said sale of contract and pertaining to that contract, and below them, the words "accepted by Buyer" as well as below his signature there the word "Buyer" again appears. No hint would seem to be disclosed by the record that any one other than Poulos would pay for Desmond's services. In fact the contrary appears for Desmond answered these questions as follows:

"Q. All right, when you got to Casper where did Mr. Poulos drive?

"A. Mr. Poulos went immediately to the Saddle Rock restaurant.

"Q. And while there did you have a conversation with him concerning your fee?

"A. I did.

"Q. During that conversation what did Mr. Poulos say about your fee and what did you say about his fee—about your fee?

"A. Mr. Poulos stated that he would pay me $9,000.

"Q. Just what did he say and what did you say?

"A. I told him that was less than the schedule allowed by the State of Wyoming and he stated, 'Ed, I think you should accept the $9,000 because you didn't know the Henning Hotel was for sale until I told you to go up and try to get it for *me*.'

"Q. And then what did you say, if anything?

"A. I said, 'If that is the commission you want to pay, then it is all right with me.' "

Desmond also stated in response to the question "Do you know any corporation of which Mr. Poulos is president? A. No I do not". Other testimony in the record is of similar purport. Not only is this true but plaintiff's pleading makes no suggestion that anyone else than Poulos at any time agreed to pay Desmond for services rendered and defendant's answer definitely states after setting forth the claim that Desmond was to obtain a loan for financing the hotel purchase in the sum of $250,000 that:

"* * * the said plaintiff failed to perform the services and furnish the consideration for the Nine Thousand ($9,000) Dollar commission which *this defendant* agreed to pay to the said plaintiff upon the conditions hereinabove stated; that by reason of said facts there was a total and entire failure of consideration to support said promise." (Italics supplied.)

Additionally it may be observed that the trial court found on conflicting evidence that plaintiff was entitled to recover from defendant the $9,000 sued for, thereby rejecting all testimony that Desmond was to obtain said loan or aid in financing the transaction before he could obtain his commission.

It is urged for defendant that the instrument sued on by plaintiff was conditionally delivered—it being asserted that the condition was that the hotel sale was first to be consummated. But the finding of the trial court in plaintiff's favor for the commission alleged to be due negatives any claim that the delivery of said instrument was a conditional one and the condition had never been fulfilled. This finding was made upon conflicting testimony. It cannot be properly said, therefore, on appeal that the sale had to be consummated before

any liability arose upon said instrument. Mr. Desmond's testimony relative to the delivery of the instrument sued on was as follows:

"Q. What happened at that time?

"A. I brought my copy of the contract agreement to George and stated that this was the agreement to pay my commission and asked him to sign. There was only one copy presented, of course. I retained Mr. Henning's copy in my office.

"Q. What was done?

"A. Mr. Poulos signed the agreement.

"Q. And after he signed it what happened then?

"A. He handed it back to me.

"Q. What did you do with it?

"A. I put in it my pocket."

The contract of sale agreed to by Henning appears in the record as plaintiff's Exhibit 1. Below the signature of George M. Poulos and as a part of the printed form —a standard form approved by the Wyoming Real Estate Board—which was used by Desmond in drafting the sale/contract there appears the following:

"Undersigned Owner accepts the foregoing offer this _____day of_____has been advised of and will pay to Agent commission as proposed by schedule of Wyoming Real Estate Board, and that in event sale is not completed by Buyer's failure or refusal to do so and Owner elects to accept the deposit made herewith, as above provided, as fixed and liquidated damages, that one-half of such deposit, but not exceeding regular commission, shall be divided equally between the Owner and Agent."

Henning's signature is affixed below the language just quoted. The under-scored words of this quotation just made were all crossed out by typewriter x's. The undisputed testimony of Desmond is that he directed Henning's personal auditor and tax consultant, one Fuller, to cross out the entire paragraph as printed be-

cause Henning was not to pay Desmond any fee in connection with the sale transaction:

"Q. All right, after you got to the Henning Hotel what took place there?

"A. Mr. Fuller, Mr. Henning's accountant stated if I had the forms and I said, 'Yes.' So he took my forms and I told him that there should be an original and two copies and on his typewriter he inserted what I was instructed to have put in the contract and what he was instructed by Mr. Henning to put in the contract. Then, when that was typewritten I told Mr. Fuller to cross out the commission in the printed form as Mr. Henning wasn't to pay a commission to me but my client was to pay the commission."

This instruction Mr. Fuller omitted to follow. Henning never elected to accept the $5,000 check deposit required by said contract of sale as liquidated damages and he died twelve days after signing the contract of sale. Desmond never demanded or accepted a fee from Henning or Henning's estate.

It is contended for Poulos that the latter was to be excused from paying a commission to Desmond if the contract of sale was not completed. There are a number of conclusive answers to this contention. However the district court's finding that Desmond was entitled to recover from Poulos the commission sued for, of course, rejects such a contention upon substantial evidence. Desmond testified, as we have seen, that Poulos was to pay the commission. The written instrument pleaded in plaintiff's petition is, of course, to the same effect. It is to be observed that no qualifications were inserted in that instrument. Our conclusion is that that part of the judgment of the district court involved in the appeal in case No. 2494 should be affirmed.

### No. 2495

We will now consider that portion of the judgment

under review which directed a recovery against the plaintiff on defendant's cross-petition. There has been set forth hereinabove the substance and theory of that pleading.

The contract of sale here involved, known as plaintiff's Exhibit No. 1, which was signed by Henning as owner, and George M. Poulos as buyer after describing the subject matter of the sale as "property situated in Natrona County, Wyoming, described as Hotel Henning, located in Casper, Wyoming, and situated as follows: Lots 17 and 18, Block 8, Casper," continues in part thus:

"* * * together with all buildings and other improvements thereon and all fixtures therein, including but not restricted to following property if in or on the premises at time of sale, the property of the Owner, and not otherwise, excluded, to-wit: roller shades, venetian blinds, curtain rods, linoleum, ranges and heaters, storm sash, screens, electric fixtures, and awnings, for a total PURCHASE PRICE of $450,000.00 on following terms and conditions, to-wit: $5,000.00 deposit with this offer as part payment to be held by Agent pending exchange of final papers, subject to the following contractual conditions, and the balance of the purchase price to be paid as follows: *The balance of purchase price to be paid not later than September 1, 1948. This purchase price to include buildings situated as above and including real estate with improvements at $200,000.00. The balance to cover the equipment, furniture and fixtures, and inventories. The liquor inventory to be $18,000.00 with 5% tolerance.*"

All of the three printed forms used by Desmond in the preparation of the contract of sale for Henning's signature were in print type except what is above underlined. The underlined part was put in the form blank in typewriting. It is reasonably clear that the printed forms thus used did not exactly conform to what the parties had agreed upon and actually intended. That is

demonstrated by what has already been set forth in case No. 2494 supra involving the matter of the owner's election to retain the $5,000 deposit as well as the statement in the foregoing quotation that that deposit was to be held by Desmond as agent. It is undisputed that the amount last mentioned was in the form of a check signed by Poulos who designated himself as "of the Poulos Provision Company." Who were interested in that Company does not appear in this record. That check was delivered to Henning and was not held by Desmond as agent. Henning, as we have seen, retained the check for twelve days before his death. On the day he died, July 29th, 1948, his bookkeeper, a Mrs. Mackey, Mr. Henning at that time being seriously ill, not knowing what to do with the check deposited it in the Wyoming National Bank before the bank closed that night. Mr. Henning died that evening. The record discloses that Mr. Henning in his lifetime did not know that the check was so deposited. At any rate Henning's estate received and now holds the money called for by the check. That money never at any time came into the plaintiff's hands. The record may be searched in vain for any statement by Desmond that he would refund the check aforesaid or the money for which it was drawn.

Let us now examine the testimony concerning this check as given by the defendant and his witnesses inasmuch as he was the successful party upon that phase of the judgment quoted above. We may also examine the testimony of the plaintiff and his witnesses not in conflict therewith.

It will be recalled that the defense interposed by Poulos to plaintiff's petition on the claim for $9,000 on account of "services rendered" was in substance that there was a failure of consideration as regards the instrument sued on in plaintiff's petition, it being alleged

that because Desmond failed to obtain the $250,000 insurance loan that "there was a total and entire failure of consideration to support said promise." It is evident from a perusal of the pleadings of the parties that the securing by Desmond of a loan of $250,000 to finance the contract of sale was a claim advanced by Poulos not only by way of defense to plaintiff's suit on the instrument quoted in plaintiff's petition, but also this was a claim urged in the cross-petition for a recovery against Desmond for the $5,000 now in the possession of the Henning estate. But the district court by its findings on plaintiff's petition and giving judgment thereon in Desmond's favor, must have concluded that Desmond did not undertake to obtain the loan aforesaid in support of the sale contract. Otherwise the finding would have been against Desmond and he would have entirely failed in his action against Poulos. It can hardly be that the fact thus found in connection with Desmond's petition and defendant's answer would be different as to the cross-petition with the same record furnishing the basis for the fact finding. In other words the facts found in support of plaintiff's pleading can hardly be found differently when the claims of the cross-petition were passed upon. There is but one record before us in this matter.

So the cross-petition's assertion that:

"* * * the said plaintif" represented to the defendant that if anything should happen which would prevent the consummation and completion of the purchase contemplated by said agreement that he, the said plaintiff, had arranged with the said W. F. Henning, for the return and refunding of said Five Thousand ($5,000.00) Dollars down payment, so that in any such event, neither this defendant nor his associates would have incurred any loss or expense, other than the expense of their trip to Casper, Wyoming."

must be examined in the light of the testimony mentioned above.

Poulos testified on direct examination in answer to the question:

"Q. Was anything said about whether a commission would be owed if the deal was not made and completed?

"A. Mr. Desmond told us he had done better than he expected because Mr. Henning was willing to give us our check back providing we could not get financing and we wouldn't have to owe him anything.

"Q. You wouldn't have to owe who anything?

"A. Mr. Desmond.

"Q. If it didn't get financed?

"A. That's right."

It is obvious that the statement of Poulos that Desmond said that Poulos would not owe Desmond anything if the contract of sale was not financed must be disregarded as in conflict with the court's finding relative to plaintiff's petition in case No. 2494 supra.

The significant part of the testimony just excerpted that Desmond told Poulos that he had done better than he had expected is the statement that Henning was willing to return the $5,000 check if the sale was not financed. Poulos does not say that *Desmond* agreed to return the check but indicates that *Henning* was "willing" to do that. On cross-examination Poulos also testified "no" in answer to the question: "Mr. Poulos, did you ever ask Mr. Desmond for your $5,000 back?" Poulos further stated that he, Poulos, never entered into an option agreement with Henning. No one else apparently ever asked Desmond to refund the check or $5,000.

Defendant's witness, Velous, testified by deposition in response to the question: "Did you hear any talk about an offer that Mr. Henning had made to finance the hotel?" answered "Yes."

"Q. What was said about that?

"A. Mr. Desmond said that if he couldn't get the money from the insurance company Mr. Henning will finance himself and at the end of this deal when he come back the second time that conversation took place, Mr. Henning also said in the event *he* don't want it, I will give *him* the $5,000 back, that's what Mr. Desmond told us."

Desmond's testimony confirms that of Poulos and Velous. In response to the question:

"Q. Now, Mr. Desmond, will you tell the conversation which took place between you and Mr. Henning and will you, as much as possible, limit it to the items I just discussed in dictating the offer of proof?

"A. Mr. Henning read the contract over, stated that it looked all right. He stated—I said to Mr. Henning, 'Of course, these boys have to get a loan.' Then he stated to me, 'If they can't get the money to buy the hotel my proposition still stands of $125,000. If they do not want to accept that then I will return the $5,000 to them because it meant nothing to me.' "

Again in response to the question :

"Q. Now, at that time was there any conversation about the $5,000 check? What did you say and what did Mr. Poulos say?

"A. After this commotion subsided why I reported to Mr. Poulos the conversation between Mr. Henning and myself and stated that Mr. Henning would refund the $5,000 deposit if they did not accept his proposition or they could not get the cash to buy the hotel, that the $5,000 didn't mean anything to him."

There is no testimony before us to the effect that Desmond said to Poulos or anyone else either that he had arranged to have the $5,000 check returned, the money refunded or that Desmond himself would return the money. The offer to return the check was a volun-

tary one made by Mr. Henning himself. The check was made payable to Henning.

When Desmond was asked on cross-examination if he told Velous and Holscher who were sitting in the Saddle Rock Cafe in Casper with Poulos that if for any reason the sale was not financed or if they didn't like the deal the $5,000 check would be returned, Desmond answered "that was the nature of Mr. Henning's words." Desmond also on cross-examination answered the query, "You told them you would?" made answer: "I didn't say I would give it back. I said Mr. Henning would give it." Desmond also testified:

"Q. Mr. Desmond did you ever ask Mr. Henning for any portion of the $5,000?

"A. No, sir.

"Q. Did you ever make demand on the Henning Estate for any portion of the $5,000?

"A. No, sir.

"Q. Did you ever tell Mr. Poulos or anyone else that you would give back the $5,000?

"A. No, sir.

"Q. Did you ever tell Mr. Poulos or anyone else that Mr. Henning would give back the $5,000?

"A. I told Mr. Poulos that Mr. Henning would give back the $5,000."

The same witness further said:

"Q. Mr. Desmond, you were asked about this $5,000 check and the return of it. Has Mr. Poulos ever asked you for the return of that check?

"A. No sir, he never did.

"Q. Has Mr. Poulos ever asked you to return the $5,000 to him?

"A. No, sir, never did.

"Q. Has Mr. Poulos ever told you you owed him $5,000?

"A. No, sir."

Mr. Desmond further testified on cross-examination:

"Q. You didn't get a letter from Mr. Henning confirming what he told you about the proposal to give back or refund the $5,000 in the event that the buyers should not accept the proposal or should be unable to finance it, for instance?

"A. No, Mr. Henning made that remark as he was going out of the door after signing the contract."

No one other than Poulos has ever claimed an interest in the $5,000 check or the money it represented, so far as this record shows.

Mr. Fuller, Henning's own tax consultant and auditor, testified:

"Q. And was there a conversation between Mr. Henning and Mr. Desmond concerning the $5,000 check?

"A. Mr. Henning—remarked the down-payment was rather low and absurd in view of the fact it was a deal for $450,000, and he also said in the event the present deal, that $450,000 didn't go through and financing wasn't agreed on later, he would return the check."

The proof is ample that Desmond never agreed to refund the Poulos check for $5,000 or the money it represented but it is to the effect throughout that Henning said he would return the check if Poulos did not finance the sale or did not want to go through with it.

Recurring to the paragraph in defendant's crosspetition where as hereinbefore outlined it is alleged:

"* * * that the plaintiff, however, failed, refused and neglected to obtain such loan by reason of which this defendant was subjected to the threat of a suit for damages for breach of said contract of purchase, but escaped such threat and liability by releasing said contract of sale which had already terminated and in turn obtaining a release from the estate and heirs of said deceased seller from any further liability under the terms of said contract,"

it is interesting to note that Poulos alleged he released the "contract of sale which had already terminated" and in turn obtained a release from the estate and heirs of the deceased vendor from any further liability. In short Poulos says he released his claim against the Henning estate or its heirs who received the money, Henning himself never claimed, but promised to refund to Poulos if the sale failed to go through. Poulos now seeks by his cross-petition to hold Desmond liable for this amount represented by the $5,000 check which Desmond at Poulos' direction turned over to Henning notwithstanding that he, Poulos, had released those who got the check and cashed it. In brief, Desmond, it seems, is sought thus to be held liable because he truthfully told Poulos what Henning had said about the latter's offer to return the check. It would hardly seem such a result should be regarded as equitable.

That part of the judgment involved in the appeal in No. 2495 therefore should, we think, be reversed. This conclusion results in a judgment in plaintiff's favor for the $9,000 commission sued for without any deduction on account of the matters set forth in the alleged cross-petition. The judgment in the entire case under review will be thus modified and as thus modified will be affirmed.

*Modified and Affirmed.*

KIMBALL, C. J., and BLUME, J., concur.